UNITED STATES, Appellee,

v.

Private First Class Todd A. DOCK, 218–94–5662, United States Army, Appellant.

CM 446898.

U.S. Army Court of Military Review.

10 May 1988.

For Appellant: Morris B. Abram, Esquire (argued); Douglas G. Morris, Esquire, William Gray Schaffer, Esquire, William J. Holmes, Esquire, Phillip R. White, Esquire, Lieutenant Colonel Paul J. Luedtke, JAGC, Major Eric T. Franzen, JAGC, Captain Keith W. Sickendick, JAGC, Captain Craig E. Teller, JAGC, Captain Lorraine Lee, JAGC (on brief).

For Appellee: Captain Donald W. Hitzeman, JAGC (argued); Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Lieutenant Colonel Larry D. Williams, JAGC, Captain Richard Parker, JAGC, Captain Carlton L. Jackson, JAGC, Captain Kathy J.M. Peluso, JAGC, Captain Tarek Sawi, JAGC, Captain Jody M. Prescott, JAGC (on brief).

Before the court en banc.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

HOLDAWAY, Chief Judge:

On the night of 11–12 June 1984, a German taxi driver was robbed and stabbed to death in Giessen, Federal Republic of Germany. The appellant was tried for alleged offenses arising from that incident on 30 October and 14, 15, and 16 November 1984, by a general court-martial consisting of officer and enlisted members at Butzbach and Frankfurt, Federal Republic of Germany. Pursuant to his pleas, he was found guilty of robbery in violation of Article 122, Uniform Code of Military Justice, [hereinafter UCMJ], 10 U.S.C. § 922 (1982) and, contrary to his pleas, convicted of one combined specification of premeditated murder and felony murder in violation of Article 118, UCMJ. He was sentenced to a dishonorable discharge, forfeiture of all pay and allowances, reduction to the grade of Private E-1 and to be put to death. The convening authority approved the sentence.

### I

■ On appeal appellant asserts, *inter alia*,[1] that the sum of his pleas in this case amounts to a guilty plea to a capital offense in violation of Article 45, UCMJ.[2]

---

1. Additional errors have been raised which, because of our disposition, are not discussed.

2. Art. 45. Pleas of the accused

(a) If an accused after arraignment makes an irregular pleading, or after a plea of guilty sets up matter inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, or if he fails or refuses to plead, a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty.

(b) A plea of guilty by the accused may not be received to any charge or specification alleging an offense for which the death penalty may be adjudged. With respect to any other charge or specification to which a plea of guilty has been made by the accused and accepted by the military judge or by a court-martial without a military judge, a finding of guilty of the charge or specification may, if permitted by regulation of the Secretary concerned, be entered immediately without vote. This finding shall constitute the finding of the court unless the plea of guilty is withdrawn prior to announcement of the sen-

The appellant pled guilty to unpremeditated murder of Claus Engelhardt (excepting the words "while perpetrating the robbery of Claus Engelhardt") and, in a separate specification, to the robbery of Claus Engelhardt. During the providence inquiry the appellant's colloquy with the military judge established facts which showed that the murder took place in the course of the robbery. Appellant further argues that, at the inception of the trial, trial defense counsel conceded in his opening statement that the appellant killed Claus Engelhardt in the course of a robbery. Thus the defense contention is that the appellant pled guilty to acts sufficient to constitute felony murder, presented no defense to that offense, and in essence conceded guilt to felony murder, a capital offense, in violation of Article 45 of the UCMJ.

The government contends that the two pleas do not on their face constitute a guilty plea to a capital offense and so Article 45 has been complied with. Further, the government asserts that no underlying "spirit" of Article 45 should be sought since the face of the statute is clear and, in any case, Article 45 could not have rationally been intended to require an accused to contest evidence even if he had nothing to say. Finally, the government argues that the appellant was not prejudiced since he was convicted of premeditated murder and sentenced to death on that basis. We find a violation of Article 45, UCMJ.

Article 45(b), UCMJ, provides in part: "A plea of guilty by the accused may not be received to any charge or specification alleging an offense for which the death penalty may be adjudged." The issue of pleading to a combination of offenses under circumstances similar to this case appears to be one of first impression, although for authority the defense cites to *United States v. McFarlane*, 23 C.M.R. 320 (C.M.A.1957) and the government to *United States v. Matthews*, 16 M.J. 354 (C.M.A. 1983).

In *McFarlane*, the accused was charged with felony (robbery) murder and assault with intent to commit murder. He pled guilty to the assault but not guilty to the murder. At defense request the court was instructed that under Article 45 the accused was precluded from pleading guilty to the murder. At trial, defense counsel, by failing to contest the government case and by waiving argument, conceded guilt. The Court of Military Appeals held that:

> [v]iewed from any reasonable vantage point, the means employed by counsel in this case were a direct violation of that Article. True it is the record reflects the words not guilty were uttered by the accused, but in the record we can figuratively see defense counsel shaking his head and saying, "no, it isn't so." This just happens to be one of those cases where the old rule that actions speak louder than words can be applied appropriately.

23 C.M.R. at 323.

In *Matthews*, the accused was charged with premeditated murder and rape. He pled guilty to unpremeditated murder but not guilty to rape. The defense counsel in his opening statement pointed out that the accused did not deny his guilt of murder or rape but contested premeditation. Both *McFarlane* and *Matthews* were referred to trail as capital cases.

The government's reliance on *Matthews* is misplaced for two reasons. For one thing, Matthews did not plead guilty to both the felony and the unpremeditated murder, thus his *pleas* did not establish guilt as to felony murder. More importantly, Matthews was not charged with felony murder, only with premeditated murder, and so, even had he pled guilty to the rape, it could not have been in violation of Article 45 since the two "pieces," i.e., felony and murder, would not "add up" to an offense for which the death penalty could have been adjudged since that offense had not been charged. *Cf. United States v. Wheeler*, 28 C.M.R. 212 (C.M.A.1959) (entry of

tence, in which event the proceedings shall continue as though the accused had pleaded not guilty.

plea to premeditated murder not improper where case referred noncapital).

We find the defense's argument based on *McFarlane* is dispositive. That case stands for the proposition that it is not just the pleas that are looked to but the "four corners" of the record to see if, "for all practical purposes," the accused pled guilty to a capital offense. In this case, defense counsel in his opening statement indicated that the issue had been narrowed by the accused's pleas to

> whether the death of Claus Engelhardt was a premeditated, calculated killing, as opposed to a killing that occurred when the accused attempted to inflict grievous bodily harm, while he was intoxicated, on the cab driver. The defense submits that, when you have heard the evidence, you will conclude that in fact there was a plan to rob; that's hardly in issue.

Such a statement, in conjunction with the accused's pleas, concedes murder in the course of a robbery, albeit an unpremeditated murder. Additionally, the accused made statements during the providence inquiry that clearly established the link between the murder and robbery. While those statements were not before the court-martial panel, the military judge instructed in part on findings as follows:

> *The defense theory is that Private Dock only intended to rob Claus Engelhardt; and only intended to inflict grievous bodily harm on him after he resisted.* If the evidence adduced in support of the defense theory creates in your mind a reasonable doubt of his guilt of these charges, then you must find the accused not guilty of premeditated murder. (emphasis added)

The members were in essence instructed that the accused had pled guilty to felony murder.

We find that appellant's pleas, taken within the context of this case, constituted a plea of guilty to felony murder, a capital offense. As such they were taken in violation of Article 45(b), UCMJ and should have been rejected as required by Article 45(a), UCMJ.

## II

Petitioner/appellant, both on direct appeal and citing newly discovered evidence of insanity at the time of the offenses in accordance with Article 73, UCMJ, and Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1210, asks that the court set aside the findings of guilty and the sentence and authorize a rehearing or dismiss the charges. We agree that the issue of petitioner's mental responsibility at the time of his offenses has been raised by evidence discovered post-trial.

A pretrial sanity board reported on 20 September 1984 that, while petitioner was intoxicated at the time of the offenses, he did not lack the substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the requirements of the law. The board further stated that there was no indication of "organic deficits." Petitioner had earlier been examined by a German psychiatrist whose findings were similar. Based on these reports, defense did not raise the issue of mental disease or defect at trial.

Subsequent to trial competent medical authority has reported (and it is undisputed) that petitioner suffers from an organic brain defect, ventriculomegaly, probably due to arrested hydrocephalus during childhood. Further, after an additional psychiatric examination, it has been opined by medical authority that "at the time of the offense in July 1984, PFC Dock suffered from a mental disease or defect, namely a partial seizure complex, petit mal epilepsy, in combination with temporal lobe seizures" and that as a result of this disease or defect petitioner, at the time of the offenses, was unable to distinguish right from wrong or conform his conduct to law.[3] After receiving this information, the court ordered an additional psychiatric examination.

---

**3.** This post-trial report has been reviewed by an additional psychiatrist who opined that it represents a professionally reasonable opinion which raises a substantial issue as to petitioner's mental responsibility at the time of the offenses.

The sanity board ordered by this court, consisting of two psychiatrists and one neurologist, concluded, *inter alia*, that the appellant at the time of the offenses had a mental disease or defect, hydrocephalus evidenced by ventriculomegaly, which "may play a role in the dyscontrol that PFC Dock experiences when intoxicated." The board found that, when sober, the appellant did not lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The board was of the opinion that his organic brain defect may affect appellant's susceptibility to alcohol which makes the appellant more aggressive but that the appellant was aware of and had the capacity to understand that alcohol made him more aggressive.[4] The board stated that there is no reason to believe that the appellant has suffered from any type of seizure discovered during his life, to include temporal lobe seizures or petit mal epilepsy at the time of the offenses.

■ When, as in this case, the issue of insanity is not litigated at trial and evidence of insanity is newly discovered after trial, the question before this court is whether sufficient evidence has been introduced to raise a substantial issue of mental responsibility. *United States v. Triplett*, 45 C.M.R. 271 (C.M.A.1972); *see also United States v. Lilly*, 25 M.J. 403 (C.M.A. 1988); *United States v. Roberts*, 18 M.J. 192 (C.M.A.1984).[5] In *United States v. Lilly*, the Court of Military Appeals reversed this court because we weighed the post-trial evidence of insanity, which was conflicting, and found the accused mentally responsible. Chief Judge Everett, writing for the Court, ruled that "a court-martial should decide whether an accused is mentally responsible after a substantial issue has been raised by new evidence not cumulative of that presented at trial." *Lilly*, 25 M.J. at 408. The Court also stated that

"the mere existence of conflicting opinion does not necessarily require a rehearing," *id.* at 407 (quoting *Triplett*, 45 C.M.R. at 277), but that "[t]he Court of Military Review was required ... to determine whether this new evidence ... *might* persuade a fact-finder to acquit.... In other words, is it foreseeable that ... the factfinder ... *might* have a reasonable doubt as to appellant's mental responsibility?" *Lilly*, 25 M.J. at 408 (emphasis supplied). If the answer is in the affirmative, then the case must be returned for a rehearing.

■ In his concurring opinion in *Lilly*, Judge Cox opined that evidence sufficient to require a defense instruction on insanity was not necessarily enough to raise a post-trial mental responsibility issue within the meaning of paragraph 124 of the 1969 Manual for Courts–Martial. He would propose a test for the Courts of Military Review that would permit affirmance unless the Court determined, after reviewing all the evidence, that a different verdict might "reasonably result" because of the new evidence. We read this as establishing a substantially higher threshold for an accused to meet than does the principal opinion of the Chief Judge. Judge Cox's standard is not too different from the standard for a new trial under Article 73, UCMJ, wherein no relief would be granted unless the accused could convince the appellate court of a likelihood that there would be a different result. Moreover this test would permit the appellate court to do some considerable weighing of the evidence. If Judge Cox's standard was the one to apply we would have no hesitancy in this case, after reviewing and weighing all the evidence, in concluding that a different result probably would not reasonably result. However the standard we must apply, as noted above, is whether the new evidence *might* create a reasonable doubt *at a court-martial*.[6] That seems to us little

---

4. Whether appellant was aware that "alcohol made him more aggressive" is a question of fact to be decided, if necessary, by the trier of fact.

5. The offenses in this case occurred prior to the adoption of the 1984 Manual for Courts–Martial. The issue we decide today is therefore governed by the provision of the 1969 Manual.

6. We are constrained to note that our brothers in their dissenting opinion have been selective in their rendering of the facts in connection with the insanity issue. Moreover, they have marshalled the "facts," weighed the "evidence," analyzed the relative merits of the expert "testimony," and determined the ultimate issue of

different than an "evidence-sufficient-to-require-an-instruction" standard despite protestations by the Court to the contrary. We have a difficult time envisioning a case where an appellate court could ever conclude that a fact finder *might* not find reasonable doubt if there is evidence sufficient to require an instruction. Certainly in this case where there is a conflict between seemingly equally qualified expert witnesses we cannot rule out the contingency that a court-martial after hearing the witnesses, observing them, and having them subjected to cross-examination might find the defense witnesses more credible or, at least, have a reasonable doubt raised. We as an appellate court may have doubts that this would happen; we might even conclude that the government witnesses are more persuasive, their examination more thorough, and their diagnosis more consistent with the facts. Such a conclusion would inevitably be based on a weighing process. Under *Lilly* and *Triplett* that is a function for fact finders at the trial level. We simply cannot rule out the possibility that a court-martial given an instruction that the defense of insanity has been raised might acquit.

■ We conclude further, in accordance with the requirements placed on us by *Triplett* and *Lilly*, that the post-trial evidence is not sufficient to raise a reasonable doubt in this tribunal as to the appellant's mental responsibility at the time of the commission of the offenses. We decline therefore to dismiss the charges. We do find that the evidence does raise a substantial issue that, in accordance with the authorities cited above, must be resolved at the trial level.

Accordingly, because of our holdings with regard to both Article 45, UCMJ, and the sanity issue, the findings of guilty and the sentence are set aside. A rehearing

may be ordered by the same or a different convening authority.

Senior Judge ADAMKEWICZ, Senior Judge COKER, Senior Judge FELDER, Judge LYMBURNER, Judge GILLEY, and Judge SMITH concur.

Senior Judge DeFORD concurs in Part I and the result. Judge KENNETT concurs in Part II and the result.

De GIULIO, Senior Judge, CARMICHAEL, Judge, and ROBBLEE, Judge, with whom Judge KANE concurs, dissenting:

The appellant was tried in 1984 by a general court-martial composed of officers and enlisted members. He was charged with one specification of premeditated murder, which included murder while committing a robbery, and one separate specification of robbery, in violation of Articles 118 and 122, UCMJ, respectively.[1] He entered pleas of guilty to the robbery specification and to unpremeditated murder excepting from the specification "premeditation" and the felony-murder language. He was found guilty as charged and sentenced to death. The convening authority approved the sentence.

The evidence of record establishes that prior to the crime the appellant and his roommate had been drinking wine. The appellant told his roommate that he was going out "to get me a Rad," meaning a German national. While making this statement, he was playing with a very sharp knife. The appellant suggested that he and his roommate go for a ride in a taxi and rob the taxi driver. Ultimately the appellant proposed an altered "plan." He would pull a knife, cut the taxi driver's throat, steer the taxi off the road and take the money. Although he assured his room-

---

appellant's mental responsibility. That is, of course, exactly what we, as an appellate court, should not do under the guidelines of *Triplett* and *Lilly*. While we can do a *limited* amount of weighing evidence to determine whether there is an issue, once we have done that the finding of facts and the weighing of the evidence are to be done at the trial level where the expert testimony can be produced in open court before the

trier of fact, subjected to cross-examination, and argued by opposing counsel regarding the relative weight to be accorded each opinion.

1. In Charge I and its Specification, the appellant was charged with premeditated *and* felony murder, and in Charge II and its Specification, robbery.

mate there was no way to get caught, his roommate refused to go with the appellant. The appellant threatened to "come back and get [him]" if he said anything. The appellant next went to the unit military police shack where he obtained a pair of white gloves which had been confiscated from him earlier. The appellant showed his knife to the sergeant at the shack and left, stating he had to take care of some business. At the time, the appellant's breath smelled of alcohol but there were no other signs of intoxication. The appellant's confession to the German police revealed that he got into a taxi at the main gate of the caserne and eventually requested the driver to take him to the Green Apple Club in Giessen. While enroute, the appellant pulled out his knife, placed it against the taxi driver's body, and told the driver to pull off the autobahn and give the appellant his money. The taxi driver resisted and tried to take the knife away. The appellant stabbed him in the side several times. The taxicab hit the guard rail at the side of the road and stopped. The appellant stabbed the taxi driver in the neck and pulled him out of the taxicab toward the back of the car. The driver grabbed at the appellant's arm and the appellant stabbed him in the stomach. He then dragged the driver to the left side of the car and left him lying under the guard rail. It was later concluded that a knife wound to the upper left chest of the driver had penetrated the heart and a blood vessel, causing death. Overall, the driver was stabbed seventeen times. The appellant returned to the car and found a wallet containing money. Because he could not start the car in order to drive away, he ran down the autobahn. He threw away the knife, its sheath, and the white gloves. He removed the contents of the wallet, placed them in his pocket and discarded the wallet. He decided not to "hitchhike" because he was so bloody.

Meanwhile, German police were responding to an alert to check a standing vehicle on the autobahn. They observed the appellant standing beside a truck trying to get a ride from the driver. When the driver indicated he could take no passengers, the police placed the appellant in the back seat of the patrol car to give him a ride to the police station. On the way, they noticed a mini-van and the taxicab on the side of the autobahn. Upon investigation, they discovered the dead taxicab driver. Becoming suspicious that the appellant was involved in the homicide, the police handcuffed him. Using a flashlight, they observed blood on the appellant's hands and slacks. A subsequent search beneath the front seat of the police car disclosed the victim's bank book, driver's license, and money. At the police station, the appellant made a graphic and detailed confession of the crimes.

Subsequently, German authorities conducted a psychiatric evaluation of the appellant. The evaluation revealed that the appellant disliked and mistrusted the German people, that he was in Germany against his will, and that he would rather face the death penalty than be subjected to German experts or judicial authorities. It also revealed "that [the appellant] thinks he ... always had problems [controlling] his intelligence and rank[s] parallel to Einstein," and that the appellant felt the Army is a "stupid institution" which made him do insignificant things. The evaluation found that the appellant must prove to himself and others his extraordinary intelligence. It found no indication of epilepsy or cerebral disorder in the appellant's perception and intelligence functions. The report concluded that the appellant was a highly talented "juvenile" who understood without limitation the illegality of his act.

Prior to trial, a U.S. Army sanity board was conducted and opined that, although the appellant had a mental disease or defect of alcohol intoxication at the time of the crime, he did not lack substantial capacity to (1) appreciate the criminal nature of his conduct, (2) conform his conduct to the requirements of law, (3) form the specific intent to kill, (4) form the specific intent to rob, or (5) entertain the premeditated design to kill. In addition, the board determined that the appellant did not suffer from a personality disorder which may have affected his thoughts and actions. The board further found the appellant's

intelligence quotient of 132 placed him in the "very superior" intelligence range. Finally, the board found the appellant had sufficient mental capacity to understand the nature of the proceedings against him and to conduct and cooperate in his defense.

In an affidavit properly admitted before this court, trial defense counsel stated that an interview with the president of the sanity board revealed that the appellant "[c]ut a poor figure before the board. He was unrepentant and ... possessed the capacity to form a specific intent to kill [the taxi driver] and was likely to kill again." Further, in his affidavit, trial defense counsel noted that interviews with the commander of the confinement facility, where the appellant was held for six months in pretrial confinement, disclosed the commander's opinion that the appellant, although a model prisoner, was "cold-blooded, manipulative and unrepentant." Understandably, trial defense counsel decided not to raise the issue of insanity at trial.

Subsequent to his conviction and confinement at the U.S. Disciplinary Barracks, Fort Leavenworth, Kansas, it was determined that the appellant had hydrocephalus at childhood. On appellate review, to support a petition for new trial, the appellant submitted a psychiatric evaluation by Dr. Janieth Wise, a civilian psychiatrist. In her opinion, the appellant, at the time of the offenses, "[suffered from a mental disease or defect, namely a partial seizure complex, petit mal epilepsy, in combination with temporal lobe seizures." Dr. Wise further opines that the appellant's hydrocephalus "created a framework for the seizure episodes ... which [she] believe[s] ... occurred at the time of the crime[s]." Consequently, her report concludes that the appellant "was unable to conform his conduct to law or to distinguish between right and wrong." In addition to Dr. Wise's report, the appellant submitted an affidavit from a Dr. Weinstein which attempts to bolster Dr. Wise's theory by stating that her position is reasonable and even persuasive. Becuase of this new evidence that the appellant was not mentally responsible at the time of the offense, his appellate counsel contend that he is entitled to a new trial.

On 5 May 1987, this court ordered a sanity board be convened to evaluate the appellant's mental responsibility at the time of the offenses, as well as his mental capacity at the time of trial and presently. This court ordered that the report be returned to it through The Surgeon General of the Army. After hearing extensive testimony from the appellant, the board found the following: (1) that at the time of the offense the appellant had a mental disease or defect, to wit: hydrocephalus, which may have played a role in dyscontrol when the appellant was intoxicated; (2) that the appellant, as a result of the mental disease or defect, did not lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; (3) that the appellant's capacity to make rational decisions and control impulsive behavior could have been diminished, but that the appellant knew of his increased susceptibility to the effects of alcohol and chose to disregard the consequences; (4) that the appellant possessed sufficient mental capacity to stand trial and sufficient mental capacity to cooperate in and conduct his appeal; (5) that the appellant did not suffer from lack of partial mental responsibility; (6) that there was no evidence the appellant suffered from seizures at *any* time in his life, particularly on the night of the murder.

The sanity board explained that, while the appellant had a hydrocephalic condition evidenced by ventriculomegaly, that condition, either alone or in conjunction with alcohol intoxication, had not produced evidence of seizures, brain damage, or lack of mental responsibility. It stated that alcohol intoxication alone is well-known to be associated with episodes of poor judgment, impulsive behavior and violence. Although the appellant had a tendency to fall prey to these effects of alcohol, he freely chose to consume it on the night of the murder and did not do so as a result of any mental impairment. The Surgeon General concurred in the findings and conclusions of this report.

This court now has determined that the case should be returned for a rehearing. We respectfully disagree with our brothers. Unlike the majority, we believe the rules concerning raising insanity on appeal still are found in *United States v. Triplett,* 45 C.M.R. 271 (C.M.A.1972). *Triplett,* which also involved a homicide, contains the test to be applied when mental responsibility is first raised on appeal.[2] In that case, the Court of Military Appeals decided that an appellate court could not determine the ultimate issue of mental responsibility, but could only determine if the issue were raised by the evidence presented on appeal. The applicable test is whether, considering all the matters pertinent to the issue, a different verdict might reasonably have resulted if the issue were again presented to a court-martial.[3] Moreover, "the *mere existence of conflicting opinion* does not necessarily require a rehearing." *Triplett,* 45 C.M.R. at 277 (emphasis added) (citation omitted); *see also United States v. Lilly,* 25 M.J. 403, 410 (C.M.A.1988) (Cox, J., concurring). Once the issue is raised, the case must be returned for a rehearing or dismissed. Chief Judge Holdaway, writing for the court, decides the mental responsibility issue on an "evidence sufficient to require an instruction" standard, citing *Lilly.* This, we believe, is an error in law since we read *Lilly* as doing no more than reaffirming the *Triplett* standard. In this regard, we note that the Court of Military Appeals recently approved application of the *Triplett* standard while citing *Lilly.* The Court upheld this court's decision that mental responsibility was not raised by a post-trial psychiatric report, prepared some twenty-two months after the offense, which found that the accused suffered from a mental disease or defect. *United States v. Martin,* 26 M.J. 172 (C.M.A.1988) (summary disposition), *aff'g,* 19 M.J. 621 (A.C.M.R.1984). In *Martin,* this court stated:

Applying [the *Triplett*] test, we are convinced that the issue of appellant's mental responsibility at the time of the offense has not been raised. The post-trial psychiatric report is only one of many factors to be considered. *United States v. Brazil,* 4 M.J. 668 (A.C.M.R.1977). Appellant was psychiatrically evaluated by military doctors before his original trial, and they determined that he did not suffer from a mental disease or defect. Additional evidence of appellant's sanity is manifest in his trial, including the rational and coherent nature of appellant's dialogue with the military judge during the providence inquiry and of appellant's extensive sworn testimony prior to sentencing. Due to the limited nature of the post-trial examination and the length of time which elapsed between the date of the offense and the post-trial mental examination, the post-trial report is entitled to little weight when compared with the original report, at least in the absence of any evidence that these factors should be discounted in the assessment of its probative value. Thus, it is not reasonable to suppose that a different verdict would result from a rehearing. *See United States v. Brazil,* 4 M.J. 668 (A.C.M.R. 1977); *United States v. Bledsoe,* 16 M.J. 977 (A.F.C.M.R.1983); *United States v. Gay,* 16 M.J. 586, 604 (A.F.C.M.R.1983) [*affirmed,* 18 M.J. 104 (C.M.A.1984)].

19 M.J. at 623.

In the case before us, although the post-trial sanity board found a mental defect or disease, it otherwise reached the same conclusions of the pretrial German psychiatric evaluation and the pretrial sanity board, to wit: that the appellant was mentally responsible at the time of his offenses. These reports paint a picture of the appellant as an immature, egotistical individual with superior intelligence who believed he could "get over the others." In actual fact, the only report which finds the appellant not mentally responsible is Dr. Wise's,

---

**2.** We recognize that the mental responsibility issue in *Triplett* was litigated at trial, but we interpret the *Triplett* analysis to be equally applicable to the facts before us.

**3.** In *Triplett,* the court found the issue was not raised even though a post-trial sanity board found the accused *not* mentally responsible at the time of the offense. The Surgeon General concurred in that report.

which was prepared over thirty months after the offenses. With regard to Dr. Wise's report, we give little weight to Dr. Weinstein's bolstering statement that the report is reasonable and persuasive. Indeed, based on our reading, the record of trial not only fails to raise a mental responsibility issue of substance, but shows the appellant to be a violent, highly intelligent individual who planned and executed both a robbery and a brutal murder.

Thus, applying the rule announced in *Triplett* and reaffirmed in *Lilly*, and considering all matters on the issue, we do not believe a different verdict might reasonably result if the new evidence were presented to a court-martial. Accordingly, we would not return the case for a rehearing.[4]

Article 45(b), UCMJ, prohibits receipt of a guilty plea "to any charge or specification alleging an offense for which the death penalty may be adjudged." The appellant contends that his pleas of guilty to unpremeditated murder and robbery violate Article 45(b) because they constitute a plea of guilty to felony-murder, a capital offense. A majority of our brothers find merit in this contention also. They conclude that the appellant's plea to robbery is "irregular" under Article 45(a), and, consequently, should not have been accepted by the military judge. With regard to the alleged error, we disagree with those of our brethren who conclude that Article 45 was violated. We find no error.

The pleas in this case comply with the express wording of Article 45(b). The appellant pled guilty to one charge of unpremeditated murder and one charge of robbery. Standing separately, neither charge permits imposition of the death penalty. If the appellant had been convicted of both unpremeditated murder and robbery pursuant to his pleas, the maximum permissible punishment would have been life imprisonment, not death. The language of Article 45(b) is plain and unambiguous on its face, prohibiting a guilty plea "to any charge or specification" for which the death penalty may be imposed. Under basic principles of statutory construction, the unambiguous language should be applied as written. *Sutherland Statutory Construction* § 45.02 (C. Sands 4th ed. 1972). Since Article 45(b) does not discuss any combination of offenses, which together might constitute a capital offense, we fail to see how the appellant pled himself into the death penalty.[5] Moreover, the Article's language does not prescribe the manner in which a case is to be litigated. If Congress, through the enactment of Article 45(b), intended to prescribe a fixed litigation strategy for all capital cases it clearly did not do so in the letter of the Article.

In the instant case, one need only refer to the overwhelming amount of evidence presented by the government at trial to appreciate fully the defense counsel's dilemma. That evidence precluded any conceivable defense to felony-murder. Thus, in our view, trial defense counsel did not violate Article 45 in having the appellant plead guilty to robbery while contesting

---

4. The majority suggests that we have been selective in our rendering of the facts on the insanity issue, and, further, that we have decided the ultimate issue of mental responsibility. As to the former comment, we would note that relatively few facts pertaining to the insanity issue are included in the principal opinion and that, because we view this issue as one of both fact and law, we believe the inclusion of sufficient facts is essential to the issue's proper resolution. Hopefully, their recitation has not been injudicious. With regard to the statement by our brothers that we have decided the ultimate issue, we simply reply that we have not. What we have done is apply the law of *Triplett* and *Lilly* to the facts and concluded that the appellant has not raised the issue of mental responsibility. It is not our methodology that differs so much from that of the majority, as it is our interpretation of the law. It is from the latter difference that this dissent, in part, evolves.

5. Our brethren, who find an Article 45 violation in this case, rely on both subsections of the Article. They believe subsection (b) was violated because the appellant "in essence" pled guilty to the capital offense of felony-murder. This, in turn, constituted an "irregular pleading" under subsection (a) and required the trial judge to enter a not guilty plea to the robbery charge and specification.

premeditation.[6] Defense counsel focused solely on premeditation believing that, if the court members reasonably doubted its formation, they would not sentence the appellant to death. In our opinion, Article 45 does not prohibit defense counsel from making this kind of decision.

Further, in applying an objective standard of reasonableness, we find no deficiency in this particular counsel's professional judgment or conduct. *See generally Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, under the circumstances, we have no reason to doubt the soundness of trial defense counsel's tactical decision despite its lack of success. Because the separate charges to which the appellant pled guilty did not subject him to the death penalty, we find compliance with Article 45(b) in fact and law.

Nor do we find any other matter affecting the providence of the appellant's guilty pleas to unpremeditated murder and robbery.

As for precedent, our research leads us to conclude that, with regard to whether the appellant's pleas violated Article 45(b), this is a case of first impression. However, we believe the Court of Military Appeals provides ample support in *United States v. Matthews*, 16 M.J. 354 (C.M.A. 1983), for our position that no violation occurred. There, the accused, in a capital case, was charged with both premeditated murder and rape. He, like the appellant, pled guilty to unpremeditated murder but the military judge refused to accept his plea of guilty to rape. Since the case had been referred for trial as capital, the maximum permissible punishment for the rape alone was death. So, in *Matthews*, receipt of a guilty plea to rape was expressly prohibited by Article 45(b). Of course, the separate robbery in the instant case is not of itself a capital offense.

Also, as did the appellant, the accused in *Matthews* conceded sufficient facts to prove felony-murder while presenting no defense. Private First Class (PFC) Matthew's counsel, in his opening statement to the members, informed them that, although the accused did not deny his guilt of murder or rape, the crucial issue was whether the accused had the ability to premeditate and did in fact premeditate in murdering the victim. The court concluded that this was a "readily understandable" tactical decision by the defense counsel in light of (1) the overwhelming evidence introduced against the accused, (2) counsel's desire not to lose credibility with the members by disputing matters "obvious" from the evidence, and (3) the absence of a mental responsibility defense. *Matthews*, 16 M.J. at 363–64.

It appears to us that *Matthews* is persuasive on the felony-murder issue in the case *sub judice*. In relying on *Matthews*, we are mindful that here the appellant was charged with premeditated and felony-murder, not just premeditated murder as was PFC Matthews. However, to distinguish *Matthews* from the appellant's case on this ground would be a distinction without meaning. The accused in *Matthews* was charged with the capital offense of rape, as well as premeditated murder, and at trial conceded perpetration of the rape. In the present case, the appellant, charged with one specification of premeditated and felony-murder and one specification of robbery, pled guilty to the lesser offense of unpremeditated murder and the separately charged robbery. His concessions at trial were consistent with and did not go beyond his pleas. Although the accused in *Matthews* was not permitted to enter a guilty plea to rape, he, for all practical purposes, conceded guilt to that offense which was separately charged and a capital offense in its own right. If the tactics employed by PFC Matthews' trial defense counsel did not violate Article 45(b), certainly those

---

**6.** Our brothers' interpretation of Article 45(b) would deprive an accused of the benefit of an instruction to the members that his guilty plea should be considered in mitigation and may be the first step toward rehabilitation. We do not believe that Article 45(b), under circumstances such as these, requires or is intended to encourage appellate courts to second-guess the defense's trial strategy.

employed by the appellant's counsel did not. We note that neither counsel pled his client guilty to a capital charge or specification, neither conceded more than the government's evidence compelled, and both decided that the best tactic for avoiding the death penalty was to contest premeditation.

Further, in this case, at no time before the court members did the appellant's defense counsel concede any link between the robbery and the murder. Also, the military judge instructed the members that the appellant's pleas did not amount to a plea of guilty to felony-murder, and that to find the appellant guilty of that offense they would have to find a "causal connection" between the robbery and the acts causing the victim's death. Accordingly, we are satisfied from our examination of the record that the appellant did not expressly, nor impliedly through the trial tactics of his counsel, plead guilty to a capital offense.[7],[8] Therefore, we would not return the appellant's case for a rehearing based on this issue.

As for the remaining errors asserted by the appellant, we believe those which would not be mooted by our reduction of the sentence are without merit.

Turning to the matter of sentence appropriateness, we are well-satisfied on the facts that the appellant has not met his burden in raising the issue of mental responsibility for the first time on appeal. Nevertheless, it is uncontroverted in the record that he has an "organic brain disorder" which, in combination with intoxication due to alcohol, could have affected his behavior at the time of the commission of the offenses. This information was neither available to the court members at the time of trial nor to the convening authority when he took his action in the case. Certainly it would have been relevant in determining an appropriate sentence, even had an insanity defense been rejected at findings. *See Lilly,* 25 M.J. at 409. Further, we conclude that had it been timely known, the appellant might rationally have been spared the death penalty by the factfinders. Accordingly, in view of the foregoing, the appellant's youthfulness at the time of the offenses and the legitimate interests of judicial economy, we would affirm only so much of the sentence in this case as provides for a dishonorable discharge, confinement for life, total forfeitures and reduction to Private E–1, on the basis of our independent responsibility to ensure sentence appropriateness. UCMJ art. 66(c) (Court of Military Review "may affirm only such ... sentence or ... part ... of the sentence, as it finds ..., on the basis of the entire record, should be approved").

---

7. We agree with appellate government counsel that the appellant's reliance on *United States v. McFarlane,* 23 C.M.R. 320 (C.M.A.1957), is misplaced. *McFarlane* essentially deals with ineffective assistance of counsel in a capital case.

> There the Court of Military Appeals stated: [D]efense counsel expended no efforts in the case before findings and, while it may be that he had no defense, his court conduct, behavior, and manner of dealing with his client's life and liberty should not be a signal that he has defaulted on the merits because his client is in fact guilty.

23 C.M.R. at 323. In the instant case, however, the trial defense counsel strongly contested the only issue that rationally could have been contested, that of premeditation. He explored every possible alternative and made the most of what was available to him in representing his client.

Also, in light of *Matthews,* we do not read *McFarlane* as precedent for the rule that Article 45(b) requires an accused to contest a felony-murder charge regardless of the evidence against him. The Court in *Matthews* permitted counsel's tactic of conceding felony-murder and contesting only premeditation without finding an Article 45(b) violation.

8. Assuming *arguendo* that the appellant's plea of guilty to robbery was a violation of Article 45 under the circumstances of this case, we would test the error for prejudice. Since we would affirm a sentence of life imprisonment rather than death, we believe the appellant's pleas would be unaffected, *see United States v. Fisher,* 21 M.J. 327, 328–29 (C.M.A.1986), and that the appellant would suffer no prejudice as to the sentence. *See United States v. Kinman,* 25 M.J. 99 (C.M.A.1987); *United States v. Sales,* 22 M.J. 305 (C.M.A.1986).