**UNITED STATES, Appellee,**

v.

**Sergeant James T. MURPHY, United States Army, Appellant.**

ARMY 8702873.

U.S. Army Court of Criminal Appeals.

20 Nov. 2001.

For Appellant: Major Mary M. McCord, JA (argued); Major Scott R. Morris, JA; Captain Donald P. Chisholm, JA (on brief); Lieutenant Colonel David A Mayfield, JA (on reply brief).

For Appellee: Captain Jennifer A. Parker, JA (argued); Colonel David L. Hayden, JA;

Lieutenant Colonel Edith M. Rob, JA; Major Anthony P. Nicastro, JA; Captain Arthur L. Rabin, JA; Captain Katherine M. Kane, JA (on brief); Colonel Steven T. Salata, JA; Lieutenant Colonel Denise R. Lind, JA; Major Margaret B. Baines, JA (on reply brief).

Before MERCK, Senior Judge, CURRIE, and JOHNSON, Appellate Military Judges.

### OPINION OF THE COURT ON REMAND

MERCK, Senior Judge:

Appellant was tried by a general court-martial consisting of officers in November and December 1987. Contrary to his pleas, he was found guilty of premeditated murder (three specifications), larceny, bigamy, and false swearing, in violation of Articles 118, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 921, and 934 [hereinafter UCMJ]. He was sentenced to forfeit all pay and allowances, to be reduced to Private E1, and to be put to death. The convening authority approved the sentence.

On 25 May 1990, this court affirmed the findings of guilty and the sentence. *United States v. Murphy,* 30 M.J. 1040, 1063 (A.C.M.R.1990) (en banc). On 14 April 1992, the United States Court of Military Appeals remanded the case to this court to reexamine the sentence imposed in light of *United States v. Curtis,* 32 M.J. 252 (C.M.A.1991), and 33 M.J. 101 (C.M.A.1991). *United States v. Murphy,* 36 M.J. 8 (C.M.A.1992) (summary disposition). On 19 June 1992, the United States Court of Military Appeals amended the 14 April 1992 order so that "[c]ounsel may raise any issues not previously considered by the court." *Murphy v. Judges of United States Army Court of Military Review,* 34 M.J. 310, 312 (C.M.A.1992). On 30 March 1993, this court again affirmed the findings of guilty and the sentence. *United States v. Murphy,* 36 M.J. 1137, 1148 (A.C.M.R.1993) (en banc). On 16 December 1998, the United States Court of Appeals for the Armed Forces [1] remanded the case to this court for further review. *United States*

---

1. The United States Court of Military Appeals was renamed the United States Court of Appeals for the Armed Forces effective 5 October 1994.

*v. Murphy,* 50 M.J. 4 (1998). We heard oral argument on 25 September 2001.

Appellant asks this court to order a rehearing on findings or to affirm a life sentence. For the reasons set forth below, we order the return of this case to a convening authority for a hearing pursuant to *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967).

The facts of this case are summarized in the opinion of this court on remand, dated 30 March 1993, as follows:

The victims were the appellant's former wife, Petra Murphy, Petra's five-year-old son by a former marriage, Tim A. Herstroeter, and the appellant's twenty-one-month-old son by Petra Murphy, James. They were killed at some time prior to the appellant's departure from Germany on 20 August 1987, pursuant to orders reassigning him to Redstone Arsenal, Alabama. The appellant married Beate Murphy on 12 June 1987, without benefit of a divorce from Petra Murphy; thus, the bigamy conviction. Although an acrimonious divorce proceeding was pending in the German courts, the appellant filed for a divorce from Petra Murphy in Sampson County, North Carolina. The North Carolina court entered a decree of divorce on 22 July 1987, based on Petra Murphy and the appellant living apart for more than one year. Petra Murphy was last seen alive by Private First Class (PFC) Carlos Ruddy, a church acquaintance, on the afternoon of Sunday, 16 August 1987. Because Petra Murphy did not own an automobile, PFC Ruddy had given her a ride to the local post exchange and then carried groceries up to her apartment. On Monday, 17 August, Mrs. Kathy Swift, also a church friend, took her two children to Petra Murphy's apartment so that Petra could babysit the children. Although Petra was usually very reliable, there was no answer when Mrs. Swift knocked on the door. Mrs. Swift became concerned and checked at the kindergarten Tim attended and found that Tim was absent. Chief Warrant Officer Two (CW2) Betram Smith, Petra's pastor, became concerned after Petra missed several church activities, because she always called when she could not attend. CW2 Smith went to the apartment on Wednesday and again on Thursday or Friday but no one answered the door. He visited the apartment again on Sunday, 23 August, after Petra missed church services. He noticed an odor coming from the kitchen window and notified the German police.

The German police entered the apartment through a window. In the bathroom, they discovered the dead bodies of Petra, Tim and James. The bodies of the children lay in a partially filled bathtub. Tim was lying face up, James face down. Petra was in a kneeling position beside the tub, her head draped into the water.

Professor Doctor Hans Fredrick Brettel, a forensic pathologist, testified that Petra died by drowning; however, she had also suffered at least four severe blows to the head prior to death. One blow fractured her skull. Dr. Brettel testified that Petra may have been unconscious at the time that her head was submerged, but he could not be certain. He detected injuries indicative of choking on her neck. There were no defensive injuries on her hands or legs.

Dr. Brettel's examination of the bodies of the children revealed that both had died from drowning. He opined that the children were alive and conscious at the time of drowning. There was no evidence of any other physical injuries.

On 27 August 1987, Special Agent (SA) Charles F. Woodall of the United States Army Criminal Investigation Command (CID) interviewed the appellant at the CID office at Redstone Arsenal, Alabama, the appellant's new duty station. The appellant waived his UCMJ article 31, 10 U.S.C. § 831 [and 5th Amendment] rights. Initially, the appellant denied all knowledge of the murders and denied having been at Petra's apartment. On further questioning, the appellant admitted that he had been at Petra's apartment on the day of the murders, but insisted that he had not harmed the children. He did, however, admit that he had killed Petra: "[w]hat would you say if I told you that I killed her because she killed the children?"

The appellant stated that he had gone to the apartment to say good-bye. He and Petra argued when the appellant told her that he wanted custody of the children. According to the appellant, Petra took the children to the bathroom for a bath and returned ten or fifteen minutes later and announced that the appellant could not take them because they were dead. In this version of events, the appellant killed Petra because she had killed the children.

The appellant stated that he choked Petra but fled when she obtained a knife from the kitchen. He went to his car, put on gloves, and returned to the apartment carrying a mason's hammer. The appellant said that he returned to the apartment, asked Petra why she had killed the children, and hit her with the hammer only after she came at him with the knife. "I just stood there for a couple of minutes stunned. I could not believe what had happened and was stunned." The appellant rearranged the crime scene to make it look "like someone had broken in." He departed, taking Petra's car keys, her military identification card, and the knife she allegedly used to assault him. The appellant revealed how and where he had disposed of the keys, identification card and knife, but stated that the hammer and gloves were still in the trunk of his car. This statement was reduced to writing, sworn and signed by the appellant. The appellant also drew a detailed diagram of the bathroom correctly identifying the positions of the bodies.

SA Woodall then told the appellant that he did not entirely believe the appellant's rendition of events. The appellant responded: "[w]hat would you say if I told you that I killed one of the children and Petra killed the other one?" The appellant then stated that he had killed Petra and Tim in retaliation for Petra killing James. This oral statement was not reduced to writing. SA Woodall again advised the appellant that he did not believe him because the CID investigation had revealed that [Tim] had been killed first. The appellant then gave a third version, which was reduced to writing.

In this version, the appellant stated that most of his earlier accounts were true but that, "[t]he only portion I need to change is that part that pertains to what happened after I arrived at PETRA'S house." In this version, he and Petra were physically fighting when he began choking Petra. Tim attempted to interpose himself between the two and the appellant knocked him away. "I did not mean to hurt him but when I looked I saw that he was laying still on the floor and that his tounge [sic] was sticking out and there was blood coming from his mouth." Alarmed, the appellant "quit choking Petra." She went to the kitchen and returned with a knife. The appellant ran to his car for his gloves and hammer. When he returned, Petra attacked him and he bludgeoned her with the hammer. The appellant explained:

> I was stunned so I went to the bathroom and filled the tub with water. I then went and got Tim and placed him face up in the water and walked away. I then went to the bedroom where James was sleeping and got him. This woke him up a little and I carried him and placed him in the tub. I sat him down and held his face under water about five seconds but then realized that I could not kill my son so I allowed him to come up. I then walked away and I heard him coughing and assumed he was okay. I then went and got PETRA and placed her over the tub as previously stated. At that time I saw that James was not moving and was laying [sic] in the water but I saw that his face was out of the water. I did not check him.

According to the appellant, he then left the apartment.

This was the final written form of the appellant's statement. At the conclusion of the interview, SA Woodall asked the appellant why he had killed James, his own son. The appellant explained that he killed James because the authorities would "automatically assume" that he was the perpetrator if James survived.

While in the Mannheim Confinement Facility, the appellant also confessed his guilt to two fellow inmates, Steve Offill and Private

Michael French. The appellant told both Offill and French he wanted to take the blame fully and wanted to avoid implicating his present wife, Beate Murphy. The appellant's confessions to Offill and French were consistent with his final written statement to SA Woodall.

French testified that the appellant stated, after recounting events up to the point where Petra lost consciousness, that "he said it was like a voice that was in his mind, telling him to '[g]o get your other son because he knows you were there as a witness.'" In French's recollection of this version, the appellant likewise released James when he began to struggle and "went back into the living room and got his wife that was unconscious and his son that was unconscious and took them into the bathroom and placed them both face down into the bathtub ... Then he left." The appellant told French that this version "protected someone he loved."

In an admission to Sergeant First Class James R. Marek, the appellant stated that he had gone to say good-bye to his son but that Petra had met him at the top of the stairs with a knife. He retreated, got the hammer from the car, and confronted Petra. In this version, Tim interferes and is injured. In an ensuing struggle between the appellant and Petra, the appellant falls on Tim and breaks his ribs. Petra is thereafter injured. When the appellant sees both of them lying on the floor unconscious, he acts to "cover up" his misconduct by drowning his son.

*Murphy*, 36 M.J. at 1138–41 (quoting *Murphy*, 30 M.J. at 1045–47) (footnotes omitted).

Prior to trial, appellant's trial defense counsel requested that the accused be examined by a sanity board. *Murphy*, 50 M.J. at 12 (citing Rule for Courts–Martial [hereinafter R.C.M.] 706). After administering several psychological tests, interviewing appellant, and examining the charge sheet, sworn statements, and police records in appellant's case, the sanity board, composed of Lieutenant Colonel Charles D. Hanson, M.D., Chief, Forensic Psychiatry,[2] and Lieutenant Colonel Franklin Brooks, Ph.D., Chief, Psychology Service, reported:

> Memory and cognition appear to be within normal limits, except for some lack of recollection of details of the present difficulty.
>
> . . . .
>
> The results were consistent with levels of verbal reasoning, and abstraction significantly below average. . . . The Personality Profile was of questionable validity. The results indicated that he was consciously exaggerating and malingering probably in an attempt to obtain some goal. The [Minnesota Multiphasic Personality Inventory] was found to be similar to that of subjects who are motivated to appear inadequate, incompetent or psychiatrically disturbed. Such individuals are found to tend toward escaping responsibilities through apparent psychiatric disability. Individuals with such profiles are found to lack the experience or reference for neurotic or psychotic dispositions. This lack of such sensibility leads them to over respond on the basis of rough stereo-type and therefore endorse many statements that a bona fide psychiatric patient would not accept. . . .
>
> . . . .
>
> b. Question: At the time of the alleged criminal conduct, did the accused have a severe mental disease or defect?
>
> Answer: No.
>
> . . . .
>
> d. Question: Was the accused, at the time of the alleged criminal conduct and as a result of such severe mental disease or defect, unable to appreciate the nature in [sic] quality or wrongfulness of his conduct?
>
> Answer: No.
>
> e. Question: Was the accused, at the time of the alleged criminal [sic] and as a result of such severe mental disease or defect, unable to conform his conduct against [sic] the law?
>
> Answer: No.
>
> . . . .

2. Dr. Hanson is certified in Psychiatry by the American Board of Psychiatry and Neurology.

g. Question: Did Sgt. Murphy, at the time of the alleged offenses, suffer from [a] personality disorder or dysfunction, which while not raising [sic] to the level of a severe mental disease or defect, affect [sic] his thoughts or actions?  ...

Answer: The accused was suffering from a mixed personality disorder with anti-social and paranoid traits.  The cause or origin of the personality disorder is considered to represent long-standing factors affecting the individual generally from the time of his birth or early childhood.  Manifestations include: [3]

Defense Appellate Exhibit [Def. Appellate Ex.] BB.  The psychiatric board also found that appellant was able to cooperate intelligently in his defense.  *Id.*

About five years after his initial conviction, while this case was pending before us, appellant sought and obtained funding from the Army to employ the services of a forensic social worker, Ms. Jill Miller, to conduct a post-trial social history.  *Murphy,* 50 M.J. at 13.  Ms. Miller's investigation and report to the court included a social history of appellant's early years (birth to age eighteen) and adult years (1982–1987), a description of his conduct during pretrial confinement, and an assessment of appellant.  Def. Appellate Ex. AA.  In addition to the information produced directly by Ms. Miller's investigation, appellant submitted affidavits from medical experts, which were considered by our superior court.  *Murphy,* 50 M.J. at 6.

In April 1993, Dr. William A. O'Connor, a Ph.D. in clinical psychology, administered clinical tests, reviewed various background materials, and interviewed appellant for approximately three hours.  Doctor O'Connor's conclusions are as follows:

[A]t the time of the alleged offense [sic], [appellant did] suffer from a personality disorder and other psychological dysfunctions which would have affected his thoughts or actions.  There are indications of minimal or slight cognitive and neuropsychological dysfunction; however, the primary origin or cause of the personality

disorder with associated post-traumatic features can be specified based on clinical interview[s] and records, as well as test results indicating persistent and severe traumatic childhood abuse.

\*     \*     \*     \*     \*     \*

[T]he Sanity Board hearings were not correct or based on adequate and required assessment methods.

*Murphy,* 50 M.J. at 13; *see also* Def. Appellate Ex. JJ; Def. Appellate Ex. WWWW.  Doctor O'Connor also concluded that "[i]t is reasonably probable that the appellate [sic] was not capable of forming the requisite intent to premeditate upon the homicides which occured [sic] on August 17, 1987." Def. Appellate Ex. JJ.

Dr. William H. Carson, M.D., an Assistant Professor of Psychiatry in the Department of Psychiatry and Behavioral Sciences at the Medical University of South Carolina, also reviewed appellant's case and agreed with Dr. O'Connor's findings.  *See Murphy,* 50 M.J. at 13; Def. Appellate Ex. KK.

In October 1993, Dr. Edward C. Kirby, M.D., a psychiatrist, examined appellant for one and three-quarter hours, and reviewed background materials and the findings of Doctors O'Connor and Carson. Doctor Kirby concluded in April of 1994 that "SGT Murphy's severe mental disease or defect rendered him unable to form the requisite intent to commit premeditated murder[, and] that SGT Murphy was unable to appreciate the nature and quality or wrongfulness of his acts, and moreover, that he could not have conformed his conduct to the requirements of the law at the time of the incident in question." *Murphy,* 50 M.J. at 14; *see also* Def. Appellate Ex. LL; Def. Appellate Ex. UU.

Appellant also submitted an affidavit from Dr. James R. Merikangas, M.D., an Assistant Clinical Professor of Psychiatry at Yale University School of Medicine.  Doctor Merikangas did not personally examine appellant, but considered various background materials, to include affidavits from Geneva Williams, appellant's mother, and Henry L. Bell, appellant's uncle.[4]  In his 29 June 1994 affidavit,

---

3.  No list of manifestations is attached to Def. Appellate Ex. BB.

4.  Two sets of affidavits were submitted to our superior court from both Geneva Williams and

Dr. Merikangas concluded that "SGT Murphy suffered from a severe mental illness and that his low intellectual functioning was consistent with organic brain damage, perhaps as a result of fetal alcohol syndrome." *See Murphy,* 50 M.J. at 14; Def. Appellate Ex. MM; *see also* Def. Appellate Ex. GGG; Def. Appellate Ex. XXXX. Dr. Merikangas also concluded that "it is reasonably probable that Sgt. Murphy was not capable of forming the requisite intent to premeditate upon the homicides which occurred on April 17, 1987." Def. Appellate Ex. MM.

Appellant also offered the opinion of Dr. Jon M. Aase, M.D., a pediatrician. Doctor Aase did not personally examine appellant, but reviewed "the materials sent to [him] relative to the case of Sgt. Murphy, and in particular, the affidavit of Mr. Henry L. Bell." Def. Appellate Ex. NN. In his 1 July 1994 affidavit, Dr. Aase concluded "that the amount of alcohol allegedly consumed by appellant's mother during her pregnancy with appellant was sufficient to put him at risk of organic brain damage that would persist throughout his life," and "that further examination for fetal alcohol syndrome was clinically indicated." *Murphy,* 50 M.J. at 14.

After considering appellant's claims, our superior court determined that appellant did not receive a full and fair sentencing hearing because his counsel were ineffective. *Murphy,* 50 M.J. at 5, 15–16. Our superior court also determined that appellant's extra-record material raised the question: "whether a reasonable finder of fact, armed with this evidence, would come to the same conclusions that the court-martial did as to the findings...." *Id.* at 14 (citing *United States v. Dock,* 26 M.J. 620 (A.C.M.R.1988)). The remaining question, as stated by our superior court, is whether "[t]he newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." *Id.* at 15 (citing R.C.M. 1210(f)(2)(C)).

Thereafter, our superior court instructed this court as follows:

(1) Review the new evidence to determine if a different verdict as to findings might reasonably result in light of post[-]trial evidence;

(2) If [we] determine[ ] that the record before [us] is inadequate to resolve the factual issues regarding findings, [we] may order a *DuBay* hearing to consider the factual issues raised on appeal as to the findings;

(3) If [we] determine[ ] that a different verdict would not reasonably result as to findings, then [we] may either affirm appellant's sentence only as to life imprisonment and accessory penalties, or [we] may order a rehearing as to the death sentence;

(4) If [we] determine[ ] that a different verdict on findings might reasonably result, then [we must] order a rehearing on findings and sentence;

(5) If [we] determine[ ] that further review under Article 66[, UCMJ], 10 U.S.C. § 866 is impracticable, then in the interest of judicial economy, [we] may order forthwith a rehearing on findings and sentence.

*Murphy,* 50 M.J. at 16 (citations omitted).

As our superior court stated: "[W]e are uncertain as to the impact of the post[-]trial information on the findings of guilt. There is substantial evidence of record that contradicts appellant's claims that he could not form the requisite premeditation required for the Government to prove his guilt of murder under Art. 118(1)." *Murphy,* 50 M.J. at 16. Furthermore, "the post[-]trial information, as contained in the barrage of affidavits filed with [our superior court], has never been tested by cross-examination or by contrary testimony of government witnesses." *Id.* As our superior court stated, "We do not know if what they say is indeed the true state of affairs, because the evidence has not been tested in the crucible of an adversarial proceeding." *Id.* at 15.

While we have fact-finding powers, our original fact-finding authority is very limited. *Murphy,* 50 M.J. at 11 (criticizing the practice of deciding issues by determining which

Henry L. Bell. The first set is dated 5 July 1994, and the second set is dated 29 September 1994. *See* Def. Appellate Ex. CC; Def. Appellate Ex.

HHH; Def. Appellate Ex. DD; Def. Appellate Ex. PPP.

affidavits are more credible) (citing *United States v. Ginn*, 47 M.J. 236 (1997)); *see also United States v. Anderson*, 55 M.J. 198 (2001). Because "[a]n appellant is entitled to an evidentiary hearing if his or her post[-]trial affidavits raise material questions of fact that might give rise to relief" (*Murphy*, 50 M.J. at 16), we have determined the record before us is inadequate to resolve the factual issues regarding findings, and we order a *DuBay* proceeding to consider the factual issues raised on appeal as to the findings.

The record of trial shall be returned to The Judge Advocate General for remand to a convening authority. That convening authority will refer the record to a general court-martial for a hearing pursuant to *DuBay*. In the course of conducting this evidentiary hearing pursuant to *DuBay*, the military judge shall permit the presentation of witnesses and evidence, shall allow witnesses and evidence to be "tested in the crucible of an adversarial proceeding," and shall hear the respective contentions of the parties on the following issue:[5] Whether a different verdict as to findings might reasonably result in light of the post-trial evidence. *Murphy*, 50 M.J. at 16.

The military judge will then enter findings of fact and conclusions of law.[6] At the conclusion of the proceedings, the record, with an authenticated verbatim transcript of the hearing, shall be returned to this court for further review.

Judge CURRIE and Judge JOHNSON concur.

---

5. The military judge shall have the authority, on motion by either party or sua sponte, to order an inquiry or inquiries into the mental or partial mental responsibility of appellant and to require that at least one member of the board be a forensic psychiatrist.

6. The military judge's conclusions of law should include whether the new evidence might reasonably result in different findings with respect to mental responsibility or partial mental responsibility, i.e., the requisite intent to commit premeditated murder.