# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
GALLUP, ZOLPER, and MAGGS
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant JAMES T. MURPHY**
**United States Army, Appellant**

ARMY 19872873

3d Armored Division (trial)
Combined Arms Center and Fort Leavenworth (*DuBay* Hearing)
C.C. Jacobsen, Military Judge (trial)
Mark P. Sposato, Military Judge (*DuBay* Hearing I & II)
Lieutenant Colonel Malcolm H. Squires, Jr., Staff Judge Advocate (trial)
Colonel Lawrence E. Rouse, Staff Judge Advocate (*DuBay* Hearing I)
Colonel Michael W. Hoadley, Staff Judge Advocate (*DuBay* Hearing II)

For Appellant:  Captain Alison Gregoire, JA (argued);Colonel John T. Phelps II, JA; Lieutenant Colonel Steven C. Henricks, JA; Major Fansu Ku, JA (on brief).

For Appellee:  Captain Jaired D. Stallard, JA (argued); Colonel John W. Miller II, JA; Major Elizabeth G. Marotta, JA; Captain Michael C. Friess, JA; Captain Jaired D. Stallard, JA (on brief).

27 June 2008

--------------------------------------------------------
OPINION OF THE COURT ON REMAND
--------------------------------------------------------

MAGGS, Judge:

A general court-martial consisting of officers tried appellant in November and December of 1987.  Contrary to his pleas, the court-martial found appellant guilty of premeditated murder (three specifications), larceny, bigamy, and false swearing, in violation of Articles 118, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 921, and 934 [hereinafter UCMJ].  The court-martial sentenced appellant to be put to death, to forfeit all pay and allowances, and to be reduced to Private E1.  The convening authority approved the findings and sentence.  The case subsequently has passed through many stages of post-conviction proceedings.  In 1998, as described in depth below, our superior court vacated appellant's death sentence and

directed us to take further action. *See United States v. Murphy*, 50 M.J. 4, 15-16 (C.A.A.F. 1998). In the present litigation, we consider five assignments of error arising from protracted post-trial investigations into appellant's mental condition. We conclude that the assigned errors lack merit. To continue carrying out the instructions from our superior court, we return the record to the Judge Advocate General for remand to an appropriate convening authority for action in accordance with this opinion.

## I. Background

### A. *Court-Martial*

We have described the grisly facts of the crimes in this case in previous opinions, *see United States v. Murphy*, 36 M.J. 1137, 1138-41 (A.C.M.R. 1993) (en banc); *United States v. Murphy*, 56 M.J. 642, 643-645 (Army Ct. Crim. App. 2001), and for brevity we will repeat only some of them here. In short, the court-martial found that, while stationed in Germany in August of 1987, appellant committed the premeditated murder of his estranged wife, Petra Murphy, of their twenty-one month-old son, James Murphy Jr., and of Petra Murphy's five year-old son by a previous marriage, Tim A. Herstroeter. According to testimony of a forensic pathologist and appellant's own statements, appellant killed Petra by smashing her head with a hammer and then placing her face under water in a bathtub. Appellant also struck Tim, and then drowned both Tim and James Jr. in the same bathtub. Appellant's apparent motive for killing Petra was his entry into a bigamous marriage with another woman, Beate Murphy. Appellant apparently killed Tim because he had witnessed the murder of his mother. Appellant told an investigator that he killed James Jr. because the authorities would assume that he was the culprit if his son survived.

At this stage in the case, as explained below, a major issue is whether appellant's mental condition may have prevented him from forming the intent necessary to commit premeditated murder. We thus recount the facts pertaining to his planning and his awareness of the crimes in some detail. The record contains evidence that, before the murder, appellant was involved in bitter divorce proceedings with Petra. In connection with these proceedings, appellant told other soldiers that he would kill Petra if he had to pay alimony. In addition, appellant investigated the scene in apparent preparation for his crime. About ten or eleven days before the murder, appellant took a cab to Petra's apartment. When he arrived, he did not exit the vehicle. Instead, appellant directed the cab driver to drive him back to his own car. Appellant then drove his own car to the apartment complex and circled the area.

On the night of the murder, appellant drove to Petra Murphy's apartment. He parked his car 100 yards from her apartment so that he and his vehicle would not be

observed.  Even though it was August, appellant brought gloves with him in the car. He also brought the hammer that he would later use for the killings.

Appellant entered the apartment, quarreled with Petra, and ultimately struck her with the hammer and also hit Tim.  Appellant then filled the bathtub with water. He placed the unconscious bodies of Petra and Tim in the bathtub.  He then retrieved James Jr. from the bedroom and placed him in the tub.  Appellant turned off the water when there was enough to drown all three of the victims.

Immediately following the killing, appellant cleaned the apartment for approximately five hours.  He left no fingerprints that could be found except on one drinking glass that he apparently overlooked.  Appellant took the gloves and hammer, locking the door behind him as he left.  He disposed of the keys to the apartment and the towel that he had used to wipe away finger prints.

Upon returning to his home appellant lied to Beate Murphy about where he had been.  When later questioned by authorities about the murders, he gave incriminating statements consistent with the physical evidence.  In addition to describing the condition of the bodies, appellant drew a diagram of Petra Murphy's apartment.  Appellant also made incriminating admissions to three other soldiers while in pre-trial confinement.

**B.** *Appellate Review in this Court and our Superior Court*

On 30 March 1993, following extensive intermediate litigation,[1] this court affirmed the court-martial's findings and sentence. *See Murphy*, 36 M.J. at 1148. On 16 December 1998, however, our superior court set aside our decision. *See Murphy*, 50 M.J. at 5, 15-16.  The court determined that new information from a post-conviction investigation into appellant's mental condition raised two substantial questions:  (1) whether "a reasonable finder of fact, armed with this evidence, would come to the same conclusions that the court-martial did as to the findings," *id.* at 14, and (2) whether "the newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably

---

[1] On 25 May 1990, this court affirmed the findings of guilty and the sentence. *See United States v. Murphy*, 30 M.J. 1040, 1063 (A.C.M.R. 1990) (en banc).  On 14 April 1992, the United States Court of Military Appeals remanded the case to this court to reexamine the sentence imposed in light of *United States v. Curtis*, 32 M.J. 252 (C.M.A. 1991), and 33 M.J. 101 (C.M.A. 1991). *See United States v. Murphy*, 36 M.J. 8 (C.M.A. 1992) (summary disposition).  On 19 June 1992, the United States Court of Military Appeals amended the 14 April 1992 order so that "[c]ounsel may raise any issues not previously considered by the court." *Murphy v. Judges of United States Army Court of Military Review*, 34 M.J. 310, 312 (C.M.A. 1992).

produce a substantially more favorable [sentence] for the accused," *id.* at 15.  Our superior court therefore instructed us to take the following specific steps:

> (1) Review the new evidence to determine if a different verdict as to findings might reasonably result in light of post[-]trial evidence;
>
> (2) If [we] determine[ ] that the record before [us] is inadequate to resolve the factual issues regarding findings, [we] may order a DuBay hearing to consider the factual issues raised on appeal as to the findings;
>
> (3) If [we] determine[ ] that a different verdict would not reasonably result as to findings, then [we] may either affirm appellant's sentence only as to life imprisonment and accessory penalties, or [we] may order a rehearing as to the death sentence;
>
> (4) If [we] determine[ ] that a different verdict on findings might reasonably result, then [we must] order a rehearing on findings and sentence;
>
> (5) If [we] determine[ ] that further review under Article 66 [, UCMJ, 10 U.S.C. § 866] is impracticable, then in the interest of judicial economy, [we] may order forthwith a rehearing on findings and sentence.

*Id.* at 16 (citations omitted).

## C. *Return to this Court from Our Superior Court*

Following the issuance of these instructions, our superior court returned the case to this court.  On 20 November 2001, in accordance with instructions (1) and (2) from our superior court, we determined that the record on appeal was inadequate to resolve the factual issues regarding findings.  *See Murphy*, 56 M.J. 642.  We therefore ordered a post-trial fact-finding hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967), to determine "[w]hether a different verdict as to findings might reasonably result in light of the post-trial evidence."  56 M.J. at 648.  We will refer to this hearing as the "First *DuBay* Proceeding," to distinguish it from a subsequent hearing also ordered by this court.

## D. *The First* DuBay *Proceeding*

The First *DuBay* Proceeding took place at Fort Leavenworth, Kansas.  On 27 January 2002, the *DuBay* military judge ordered the formation of a board of experts to inquire into the mental capacity and mental responsibility of appellant in

4

accordance with Rule for Courts-Martial [R.C.M.] 706. This board, hereinafter described as the "2002 Sanity Board,"[2] consisted of Major (MAJ) David M. Benedek, M.D. (hereinafter Dr. Benedek), a board certified forensic psychiatrist; MAJ William C. Keppler III, M.D. (hereinafter Dr. Keppler), a psychiatrist and forensic psychiatry fellow working under Dr. Benedek; and Pamelia F. Clement, Ph.D. (hereinafter Dr. Clement), a clinical neuropsychologist. Dr. Benedek served as the board's president.

The 2002 Sanity Board produced a lengthy report. The board's most significant conclusions were as follows:

> 18a. At the time of the offense, appellant did not have a severe mental disease or defect.
>
> . . .
>
> c. At the time of the alleged criminal conduct, Inmate Murphy was able to appreciate the nature and quality and wrongfulness of his conduct.
>
> . . .
>
> e. At the time of the offenses, Inmate Murphy did not suffer from Post-Traumatic Stress Disorder [PTSD] or Fetal Alcohol Syndrome [FAS]. He did, however, suffer from Cognitive Disorder Not Otherwise Specified.
>
> f. The cognitive disorder that Inmate Murphy suffered from at the time of the charged offenses did not preclude his ability to form the intent to commit murder, or his ability to premeditate the act of murder, or his ability to otherwise consider the act of murder before he acted.

The 2002 Sanity Board ruled out a diagnosis of PTSD because appellant did not have the usual symptoms of avoidance, foreshortened expectations, and hyperarousal. Although appellant had been exposed as a child to physical violence in the form of abuse of his mother by a boyfriend, appellant did not avoid his childhood home or his mother's abusive boyfriend. Appellant had a lifelong ambition to join the Army. There was no evidence that appellant was prone to startled responses, excessive irritability, or hyper-vigilance.

---

[2] In 1987, before appellant's trial, an R.C.M. 706 sanity board determined that appellant, at the time of the alleged criminal conduct, did not suffer from a severe mental disease or defect; was able to appreciate the nature and quality and wrongfulness of his conduct; and did have the mental capacity to understand the nature of the proceedings and to conduct and cooperate intelligently in his defense.

The 2002 Sanity Board also ruled out a diagnosis of dissociative disorder (i.e., a disruption in the normal mechanisms of memory and perception) because the recorded observations by persons in contact with appellant in 1987 were not consistent with his having this condition. The board further rejected a diagnosis of FAS because appellant did not have any of the usual physical characteristics of this condition, other than some minor cognitive dysfunction. The board additionally rejected a diagnosis that appellant suffered from Major Depressive Disorder because observations of him at the time of the offense did not show moods, energy levels, and other symptoms consistent with this condition.

In addition to receiving the 2002 Sanity Board's report, the *DuBay* military judge held a hearing. Dr. Benedek testified as the government's only witness. He explained the Sanity Board's conclusions and how the board arrived at them. The defense called three witnesses: Edward C. Kirby, M.D. (hereinafter Dr. Kirby), a general psychiatrist; William A. O'Connor, Ph.D. (hereinafter Dr. O'Connor), a forensic psychologist and neuropsychologist; and James R. Merikangas, M.D. (hereinafter Dr. Merikangas), a psychiatrist and neurologist.

All three of the defense witnesses disagreed with the conclusions of the 2002 Sanity Board. Dr. Kirby concluded that appellant could not have formed the requisite intent to commit premeditated murder and also could not appreciate the nature and quality or wrongfulness of the charged offenses. Dr. Kirby's theory was that appellant "acted while in a dissociative state . . . and he could not recognize the wrongfulness of his behavior or control it." When asked how he reached this opinion, Dr. Kirby explained:

> I reached that opinion based on my examination and reviewing [of] the records and the psychological testing and history. Sergeant Murphy described several incidents where he was under severe stress and . . . usually was in [an] argument. One time . . . one of his girlfriends was arguing with him, and the next thing he knows he has his hand around her throat not knowing how he did it . . . because he can't stand arguments. Another time he kicked a woman out of bed with the same circumstances. He was in a fight once and he was out of control like that—snapped, . . . so that's part of the history.

Dr. Kirby's opinion was also that appellant actually had only a fragmentary memory of the killings.

Dr. O'Connor concluded that appellant was able to appreciate the nature, quality, and wrongfulness of his conduct, but Dr. O'Connor also asserted: "[Appellant] . . . absolutely lacks the capacity, the executive function [and] capacity to premeditate. He lacks the capacity to interrupt or stop a series of behaviors by any rational choice." Dr. O'Connor believed that appellant could have had chronic

PTSD in remission which was reactivated under the stress of the events in Petra Murphy's apartment. When asked to explain specifically how he reached his opinion that appellant was not capable of forming the intent to premeditate the killings, Dr. O'Connor testified:

> I based that primarily on clinical tests. His verbal memory is too impaired to remember what happened. His ability to abstract and plan was very substantially impaired, and he had very poor control of his affect, which is the post-traumatic stress.

Dr. O'Connor elaborated that "[t]here was a direct relationship between the beginning of the violent sequence," which presumably involved yelling and screaming, and "events that occurred in his family where his mother's persistent arguing, yelling, etc., led to what are described by several people as severe beatings by the man she was living with at the time . . . ."

Dr. Merikangas concluded that appellant could not form the intent necessary to commit premeditated murder. His opinion was that appellant had suffered from organic brain damage since childhood. He believed that this brain damage and other factors affected appellant's mental condition at the time of the murders. When asked to explain specifically why appellant lacked the ability to premeditate the killing of the three victims, Dr. Merikangas testified:

> Sergeant Murphy . . . had been celebrating his leaving Germany and going back to the states, [in] the traditional manner of going out and drinking all day long, and late at night—there's no evidence he had anything to eat that day, that he drank and then showed up at Petra's . . . apartment, to say goodbye, see his children, do whatever, that some sort of altercation occurred in which he then had a rage attack, an episode of loss of control, perhaps a dissociated episode, perhaps a hypoglycemic attack, perhaps any of those, or perhaps simply the effects of alcohol. This we don't know.

Dr. Merikangas further explained why he believed that appellant lacked the ability to premeditate under these specific circumstances:

> Under the very specific circumstances . . . first, he is depressed; second, he is drinking; third, he has an extreme emotional disturbance; fourth, there was an argument and he lost control. His general way of dealing with losses of control in the past was simply to walk out, to leave, to avoid any physical violence, but he was in these circumstances unable to prevent what was basically an out-of-character rage attack during which time he was not thinking.

7

After hearing this testimony, the *DuBay* military judge issued a memorandum opinion in which he made the following conclusions:

1. A different verdict as to findings would not reasonably result in light of the post-trial evidence.

2. The new post-trial evidence would not reasonably result in different findings with respect to mental responsibility or partial mental responsibility, i.e. the requisite intent to commit premeditated murder.

3. A reasonable mental health issue could have been developed during the sentencing phase of the trial based upon the post-trial evidence.

Memorandum of Decision and Findings of Fact and Conclusions of Law, *United States v. Murphy* (18 November 2002) (LTC Mark P. Sposato, Military Judge).

The military judge emphasized that he had considered the credibility of the witnesses. The military judge said: "Having had an opportunity to not only hear the evidence presented by both sides on the issues, but having also had the opportunity to observe 'how' the witnesses testified (e.g. demeanor, body language, sincerity), I found Dr. Benedek's testimony to be the most credible." In contrast, he determined that "Dr. O'Connor's and Dr. Kirby's testimony to be less credible than Dr. Benedek's." The military judge described the testimony of Dr. Merikangas as the "least credible." The military judge explained: "Dr. Merikangas displayed an obvious bias that was apparent in the manner in which he answered Government questions relating to the bases for his diagnosis and opinions."

### E. *Return to this Court from the First* DuBay *Proceeding*

The case returned to this court after the First *DuBay* Proceeding. In preparing filings for our court, appellant's counsel discovered that Dr. Benedek possessed knowledge of appellant's case prior to his participation on the 2002 Sanity Board. Based on this discovery, appellant argued to this court that the board was flawed because Dr. Benedek had a conflict of interest. We determined that the record before us was inadequate to resolve this conflict of interest issue. We also concluded that we would need more testimony about appellant's mental condition to render a decision. *See United States v. Murphy*, Army No. 8702873 (Army Ct. Crim. App. Apr. 27, 2004) (unpub.).

Based on these determinations, we ordered a supplementary *DuBay* hearing, which we now will refer to as the "Second *DuBay* Proceeding." We directed the military judge to "hear the respective contentions of the parties on the following two issues: (1) Whether a different verdict as to findings might reasonably result in light of the post-trial evidence; and (2) Whether there was an actual conflict of interest

8

involving Dr. Benedek sufficient to undermine the reliability of the 2002 Sanity Board results." In addition, because Dr. Clement was the only member of the 2002 Sanity Board who actually conducted neuropsychological tests on appellant and rendered an opinion as to the results of those tests, we instructed the military judge that Dr. Clement's testimony would be essential for making an informed decision in appellant's case.

### F. *Second* **DuBay** *Proceeding*

The Second *DuBay* Proceeding took place at Fort Leavenworth, Kansas, before the same military judge who had presided over the First *DuBay* Proceeding. The military judge held a hearing in which he heard testimony about Dr. Benedek's possible conflict of interest, additional testimony about the Sanity Board's conclusions, and testimony concerning another possible conflict of interest involving Dr. Keppler.

### 1. *Dr. Benedek's Potential Conflict of Interest*

The testimony of Dr. Benedek and Captain (CPT) Donald Chisholm established the following facts. In 2000, CPT Chisholm was one of appellant's defense appellate counsel. CPT Chisholm called Walter Reed Army Medical Center (WRAMC) in an effort to obtain expert advice regarding mental health issues in appellant's case. CPT Chisholm was directed to Dr. Benedek for advice. Dr. Benedek at the time was the director of the Forensic Psychiatry Service at WRAMC, and in this capacity he often consulted informally with defense and government counsel.

CPT Chisholm told Dr. Benedek about appellant's case and asked him for an "independent assessment of the exhibits that had been filed with [the Army Court of Criminal Appeals] by previous appellate defense counsel in the case." Dr. Benedek agreed to speak to CPT Chisholm about the case, but Dr. Benedek did not become part of the defense team and did not establish any formal professional relationship with either CPT Chisholm or appellant. Dr. Benedek also cautioned CPT Chisholm that their communications would not be confidential.

Dr. Benedek spoke personally to CPT Chisholm on a few occasions. In addition, CPT Chisholm faxed to Dr. Benedek and his colleagues the following documents, all of which were non-confidential: (1) the 1987 pre-trial Sanity Board results; (2) our superior court's decision from 1998; (3) a social history report prepared by Ms. Jill Miller; (4) five post-trial affidavits previously submitted to our superior court; and (5) all of the pre-trial statements made by appellant. Dr. Benedek and his colleagues reviewed these materials, but they did not conduct any interviews or testing of appellant.

Based on the information that he had received, Dr. Benedek told CPT Chisholm that he believed that appellant knew what he was doing on the night in question and knew that what he did was wrong; that a diagnosis of PTSD would be wrong; that appellant did not suffer from a dissociative disorder; that it is unlikely that appellant suffers from fetal alcohol syndrome; that the original 1987 pre-trial sanity board was sufficient; and that if he were a government expert, he would oppose appellant's contentions principally by discussing the facts of the crimes.

Dr. Benedek had no other connection to appellant's case until he served on the 2002 Sanity Board. When Dr. Benedek was assigned to the 2002 Sanity Board, he specifically told the lead government counsel in the First *DuBay* Proceeding, then-Major Victor Hansen, that he previously had discussed the case with CPT Chisholm. Dr. Benedek and MAJ Hansen, however, did not reveal this information to the *DuBay* military judge. When Dr. Benedek testified in the First *DuBay* Proceedings, MAJ Hansen asked him about how he had become involved in the case. Dr. Benedek responded: "I became involved in this case when the government contacted me about a need for a new sanity board, and I got some explanation of the case and was asked would I, or my service be able to provide a relook, and I said, 'Yeah.'" Dr. Benedek explained in the Second *DuBay* Proceeding, that he was not trying to be misleading but instead that he had interpreted the words "involved in the case" to mean "officially contacted" in relation to the 2002 Sanity Board. Dr. Benedek rejected allegations that he was biased, saying that he had no personal stake in the case.

At the time of the First *DuBay* Proceeding, CPT Chisholm was no longer actively representing appellant. Appellant's appellate case file included information about CPT Chisholm's communications with Dr. Benedek. Although appellant's new counsel reviewed the voluminous appellate record and a variety of notes and papers at the U.S. Army Defense Appellate Division, he did not examine the pertinent portions of the case file. He therefore did not have any actual knowledge of the communications. Neither CPT Chisholm nor MAJ Hansen nor Dr. Benedek told appellant's new counsel about the communications between CPT Chisholm and Dr. Benedek. Accordingly, appellant's new counsel did not object to Dr. Benedek's participation on the 2002 Sanity Board.

At the Second *DuBay* Proceeding, several experts testified for appellant about whether Dr. Benedek had a conflict of interest when he served on the Sanity Board. The defense called Michael Schmidt, Ph.D. (hereinafter Dr. Schmidt), an expert in neuropsychology and clinical neuropsychology, and Jerry Menikoff, M.D., J.D. (hereinafter Dr. Menikoff), an expert in the area of medical ethics. They each testified that Dr. Benedek could not form an objective opinion as a member of the 2002 Sanity Board because he already had formed an opinion in the case. The government, however, called Edmund Howe III, M.D., J.D. (hereinafter Dr. Howe),

an expert in medical and psychiatric ethics, who testified that Dr. Benedek was capable of being objective when he served on the 2002 Sanity Board.

## 2. *Further Testimony with Respect to Appellant's Mental Condition*

In the Second *DuBay* Proceeding, Dr. Clement and Dr. Keppler, who had participated on the 2002 Sanity Board but who had not testified in the First *DuBay* Proceeding, provided further information about appellant's intellectual and cognitive functioning. Dr. Clement testified that the board had tasked her with performing psychological testing on appellant to determine whether he had a cognitive disorder and whether he had the ability to plan at the time of the alleged offenses. To obtain data useful for answering these questions, Dr. Clement personally administered ten psychological tests on appellant, and she also examined the results of an eleventh test administered at Fort Leavenworth earlier in 2002.[3] Appellant's counsel did not ask for additional psychological testing. Dr. Clement formed her opinions by integrating the results of all her testing, not by simply relying on the results of a single test.

Dr. Clement concluded that appellant suffers from a cognitive disorder based on four factors. First, testing revealed a "very prominent mental slowing." Second, the testing revealed a "very significant degree of discrepancy between his best performances, which tend to be in the average range and his very worst performances, which were clearly in the impaired range." Third, appellant had an "impaired memory." Fourth, appellant suffered from a "significant impairment in higher level reasoning and abstract reasoning as applied to unstructured situations or abstract problem solving." Dr. Clement, however, concluded that appellant does have the cognitive capacity to plan. She cited appellant's strategy of preparing for two months in advance of promotion boards as an example. She also concluded that appellant's cognitive disorder was not a severe mental disease or defect.

Dr. Keppler testified that he reviewed files and documents and conducted three separate interviews of appellant. Dr. Keppler concluded that, at the time of the offenses, appellant had the ability to plan a crime. He found no mental illness that would prevent appellant from premeditating the murders. Dr. Keppler, however, did conclude appellant has a borderline personality disorder.

---

[3] Dr. Clement administered the "Wechsler Adult Intelligence Scale, Third Version," the "Wide Range Achievement test – 3 Reading Subset," the "Reading sentences and paragraphs from the Boston Aphasia exam," the "Theft of the Cookie Jar Writing Sample," the "Wisconsin Card Sorting Test," the "Trail Making A and B," the "California Verbal Learning Test-2," the "Wechsler Memory Scale-III," the "Logical Memory Passages One and Two," and the "Rey-Osterrieth Complex Figure." She examined the results of "MMPI-2 testing."

In addition to testifying about whether Dr. Benedek had a conflict of interest, Dr. Schmidt also testified about the 2002 Sanity Board's methods. He faulted the Sanity Board for focusing on cognitive testing and not performing adequate emotional and personality testing. Dr. Schmidt also asserted that Dr. Clement should have done more testing with respect to appellant's executive function, impulse control, insight, foresight, and planning.

3. *Dr. Keppler's Participation on the 2002 Sanity Board*

In addition, some of the testimony at the Second *DuBay* Proceeding concerned the circumstances of Dr. Keppler's participation on the 2002 Sanity Board. Dr. Keppler testified that he was assigned to participate by Dr. Benedek. At the time, Dr. Keppler was a "Forensic Fellow" at the WRAMC under the supervision of Dr. Benedek. Dr. Keppler testified that he did not feel any pressure to reach any result, that he was able to be objective, and that he would not have changed his report if Dr. Benedek had disagreed with him. But in response to questioning by the *DuBay* military judge, Dr. Howe, a government witness, testified that he "would expect there would be profound coercion of someone in a Fellow program finding it difficult to tell their chief that they totally disagree with their chief."

4. *Conclusions of the Military Judge*

After considering all of the additional evidence in the Second *DuBay* Proceeding, the military judge reached the following conclusions:

1. A different verdict as to findings would not reasonably result in light of the post-trial evidence.

2. There was no actual conflict of interest involving Dr. Benedek that was sufficient to undermine the reliability of the 2002 Sanity Board results. My conclusion in this regard is based upon the following factors: the informal nature of CPT Chisholm's request for an independent assessment of the defense expert affidavits; Dr. Benedek did not consider any documents that were not already part of the appellate record, and all of the documents he may have reviewed were ultimately considered by the 2002 Sanity Board; Dr. Benedek never disclosed the substance of his discussions with CPT Chisholm to the Government; Dr. Benedek disclosed his prior involvement with appellate defense counsel to the Government; Dr. Benedek did not clearly violate the AAPL conflict of interest ethical guidelines as medical ethicists reasonably differed on the interpretation of relevant provisions; and, most importantly, Dr. Benedek's candor and forthright demeanor as reflected in his testimony.

Memorandum of Decision and Findings of Fact and Conclusions of Law, *United States v. Murphy* (17 Oct. 2005) (LTC Mark P. Sposato, Military Judge).

### G. *Return to this Court From the Second* DuBay *Proceeding —The Present Litigation*

From the Second *DuBay* Proceeding, the case now has returned to this court. In his supplemental pleading, Appellant raises five assignments of error. We must resolve these assigned errors and continue to act upon the five instructions that our superior court gave us in 1998. *See Murphy*, 50 M.J. at 16. We recognize that substantial time has passed and appellant's case now has been litigated for over 20 years. While this prolonged duration is regrettable, we observe that the complexity of the case simply has made briefing, arguing, and resolving the issues time-consuming and difficult.

## II. Full and Fair Hearing into Mental Responsibility

Appellant's initial assignment of error is that he was denied a full and fair examination into his mental responsibility for the crimes committed for three reasons.[4] First, appellant renews his assertion that Dr. Benedek, the president of the 2002 Sanity Board, had an actual conflict of interest because he previously had rendered advice to appellant's counsel. Second, appellant contends that trial counsel knew about Dr. Benedek's conflict of interest but wrongly failed to disclose it. Third, appellant argues that Dr. Keppler, as a fellow working under Dr. Benedek,

---

[4] I. APPELLANT WAS DENIED A FULL AND FAIR EXAMINATION INTO HIS MENTAL RESPONSIBILITY FOR THE CRIMES COMMITTED WHERE: (1) THE HEAD OF THE SANITY BOARD AND THE BOARD'S LEAD FORENSIC PSYCHIATRIST, DOCTOR (DR.) DAVID BENEDEK, HAD PREVIOUSLY CONSULTED WITH APPELLATE DEFENSE COUNSEL, REVIEWED THE CASE FILE, AND RENDERED AN OPINION AS TO THE MERIT OF THE ISSUES HE WAS SUBSEQUENTLY ASKED TO EXAMINE AS PART OF THE SANITY BOARD; (2) THE TRIAL COUNSEL KNEW ABOUT DR. BENEDEK'S PRIOR INVOLVEMENT WITH THE DEFENSE BUT FAILED TO DISCLOSE THAT FACT TO THE OTHER TRIAL PARTICIPANTS AT THE HEARING, AND IN FACT ELICITED TESTIMONY FROM DR. BENEDEK INDICATING THAT DR. BENEDEK HAD NO PRIOR INVOLVEMENT IN THIS CASE UNTIL HE WAS CONTACTED BY THE GOVERNMENT TO LEAD THE SANITY BOARD; AND (3) THE SANITY BOARD'S OTHER FORENSIC PSYCHIATRIST, DR. WILLIAM KEPPLER, WAS A FELLOW WORKING UNDER DR. BENEDEK'S SUPERVISION, A RELATIONSHIP THAT EVEN THE GOVERNMENT EXPERT IN MEDICAL AND PSYCHIATRIC ETHICS DEEMED TO BE EXTREMELY VULNERABLE TO COERCION.

was vulnerable to coercion and should not have participated on the 2002 Sanity Board.  We disagree.

## A.  *Dr. Benedek's Actual Conflict of Interest*

Appellant initially contends that Dr. Benedek had an impermissible conflict of interest when he headed the 2002 Sanity Board because Dr. Benedek previously had rendered advice to appellant's counsel, CPT Chisholm.  Appellant and the government agree that our superior court's decision in *United States v. Best*, 61 M.J. 376 (C.A.A.F. 2005), establishes the applicable standard for evaluating this contention.  In *Best*, a court-martial convicted Private (PVT) Jermain Best of murder and other offenses.  On appeal, we called for a sanity board to evaluate PVT Best under R.C.M. 706.  The board ultimately concluded that PVT Best was not suffering from a mental disease or defect and was able to appreciate the wrongfulness of his conduct.  Subsequently, PVT Best challenged the board's composition.  He contended that two of the board members should not have participated on the board because they previously had evaluated him to determine the cause of his unusual behavior while in confinement.

Our superior court rejected PVT Best's argument.  It held that R.C.M. 706 does not "contain a per se exclusion from participation in examining boards of practitioners who have either treated or diagnosed the subject of such a board."  Instead, an expert may participate on a board unless he or she has an "actual conflict of interest."  *Id.* at 387.  In reaching this decision, our superior court agreed with our earlier holding that "an actual conflict of interest exists if a psychotherapist's prior participation materially limits his or her ability to objectively participate in and evaluate the subject of an R.C.M. 706 Sanity Board."  *Id.* (quoting *United States v. Best*, 59 M.J. 886, 892 (Army Ct. Crim. App. 2004)).  Applying this standard to the facts of the case, our superior court concluded that the two experts had no actual conflict of interest.  The court reasoned:

> . . . . [The experts] were each wearing only "one hat."  Neither was Appellant's psychotherapist.  Neither did more than a brief assessment, followed in some cases by referral to those who could diagnose Appellant and offer him treatment.  Consequently, there is no reason to question whether the board's membership complied with R.C.M. 706 or question the reliability of the trial results.

*Id.* at 388.

Appellant's lengthy brief offers five interrelated reasons for us to conclude that Dr. Benedek, unlike the Sanity Board members in *Best*, had an actual conflict of interest.  We reject each of appellant's arguments.

14

First, appellant argues that Dr. Benedek should not have served on the 2002 Sanity Board because he had already formulated an inflexible opinion on the very issue that he was subsequently asked to examine as a board member. The record does not support this contention. Dr. Benedek, whom the *DuBay* military judge found credible, testified that he could be objective. He testified further that he did not recall the specifics of his prior consultation with CPT Chisholm and that he offered CPT Chisholm only informal, objective advice. We see no evidence that Dr. Benedek's consultation with CPT Chisholm actually limited his ability to participate objectively on the 2002 Sanity Board. Although Dr. Benedek reached essentially the same conclusions both when speaking informally to CPT Chisholm and when serving on the 2002 Sanity Board, the consistency of Dr. Benedek's views alone does not indicate any actual bias. Indeed, an expert, in most instances, will adhere to his or her conclusions unless presented with new and contrary information.

Second, appellant argues that Dr. Benedek, unlike the sanity board members in *Best*, switched professional roles. Appellant notes that Dr. Benedek first served as a consultant to the appellant, and then later attempted to serve as a neutral evaluator on the 2002 Sanity Board. This contention also lacks merit. Although Dr. Benedek served in two separate capacities, his objectives remained the same. Appellate defense counsel specifically asked Dr. Benedek to provide an "independent assessment" of the evidence; Dr. Benedek performed essentially the same task when he served as a member of the 2002 Sanity Board. Indeed, by way of comparison, Dr. Benedek had far less involvement with appellant prior to the 2002 Sanity Board than the experts in *United States v. Best* had with PVT Best. Dr. Benedek was not appellant's psychotherapist and had not met with appellant. We see no evidence that he took on incompatible roles.

Third, appellant argues that we should accept the expert views of Dr. Schmidt and Dr. Menikoff. As noted above, Dr. Schmidt and Dr. Menikoff testified in the Second *DuBay* Proceeding that once Dr. Benedek reached a conclusion, it would be professionally difficult for him to change his opinion. This argument lacks merit. The question under *Best* is not whether grounds may exist for suspecting that a board member is biased, but instead whether the board member has an actual conflict of interest. Dr. Benedek did not have a conflict of interest because he had the same purpose at all times: to assess appellant's mental condition objectively.

Fourth, appellant argues that even though Dr. Benedek did not enter into a privileged and confidential relationship with appellant, he still should not have taken on the role of a neutral evaluator when he previously had "occupied the role of an advocate in the same case." This contention is simply inconsistent with the facts. Dr. Benedek did not occupy the role of an advocate. CPT Chisholm asked Dr. Benedek for an "independent assessment" of certain documents in appellant's case, and that is what Dr. Benedek provided. He did not join sides with either appellant or the government, and did not become an advocate.

15

Fifth, appellant asserts that Dr. Benedek was not candid when he testified in the First *DuBay* Proceeding about his prior involvement in the case. As noted above, when answering a question by government counsel in the *DuBay* hearing, Dr. Benedek did not reveal to the judge that he previously had given advice to CPT Chisholm. On the contrary, he said that he first became "involved in the case" when he joined the 2002 Sanity Board. In contrast, appellant asserts, the experts in *Best* "were more upfront" in discussing their prior involvement. This contention also lacks merit. The *DuBay* military judge, who observed the testimony, did not question Dr. Benedek's assertion that he had interpreted the question of when he first "became involved in the case" to mean when he first became *formally* involved in the case. Under Dr. Benedek's interpretation of the question, his answer was candid; he did not become formally involved until he served on the 2002 Sanity Board. In addition, we see no evidence that Dr. Benedek was trying to hide anything; on the contrary, the record shows that he specifically called his prior consultation with CPT Chisholm to the attention of MAJ Hansen. Accordingly, we find no lack of candor which demonstrates or even suggests an actual conflict of interest.

Although we have concluded that Dr. Benedek had no actual conflict of interest, we should address briefly two additional issues raised in the parties' pleadings. The first issue is whether appellant waived his objection to Dr. Benedek's participation on the 2002 Sanity Board. Appellant's case files documented the communication between CPT Chisholm and Dr. Benedek in 2000 and yet appellant still did not oppose the inclusion of Dr. Benedek when the board was formed in 2002. Appellant argues that we should not find waiver because it "is not logical to impute to appellant's 2002 trial defense team the knowledge of appellant's appellate defense counsel back in 2000." On the contrary, appellant asserts: "Experience and issues relevant to this case can and are easily lost in the close to 20 years it has been on appeal. Appellant should not have to bear the brunt of the unfortunate reality." We find it unnecessary to resolve this issue given that we have decided that Dr. Benedek had no conflict of interest. But we emphasize and caution for the future that defense counsel must exert such efforts as professional standards require to keep track of a client's case.

The second issue is whether Dr. Benedek's participation caused prejudice. The government argues appellant was not harmed, even if Dr. Benedek had an actual conflict of interest and should not have participated in the R.C.M. 706 Board. The government reasons that, even if Dr. Benedek had been excluded from the board, Dr. Clements and Dr. Keppler would have reached the same conclusion. Appellant disagrees, saying that the 2002 Sanity Board and Dr. Benedek's testimony constitute "the core" of the government's argument and the military judge's conclusion. Because we find no actual conflict of interest existed, we also find it unnecessary to decide whether appellant suffered prejudice.

16

**B.** *Trial Counsel's Failure to Disclose Evidence*

Appellant separately argues that he did not receive a full and fair hearing because of prosecutorial misconduct. Appellant asserts that the government counsel in the First *DuBay* Proceeding, MAJ Hansen, knew about Dr. Benedek's prior contact with CPT Chisholm but failed to disclose this information and also elicited testimony from Dr. Benedek which wrongly suggested that he had no prior involvement in this case. Both parties agree that our superior court's decision in *United States v. Santos*, 59 M.J. 317 (C.A.A.F. 2004), governs appellant's claim. In *Santos*, the court stated the following rule: "When an appellant has demonstrated that the Government failed to disclose discoverable evidence with respect to a specific request or as a result of prosecutorial misconduct, the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt." *Id.* at 321.

In applying the *Santos* standard, we are uncertain whether MAJ Hansen actually had an obligation to disclose to appellant's counsel at the First *DuBay* Proceeding that appellant's earlier counsel, CPT Chisholm, had sought advice from Dr. Benedek. As we have explained above, this information was in appellant's appellate case files, but CPT Chisholm apparently overlooked it. Yet, assuming (without deciding) that MAJ Hansen had a duty to disclose the information to appellant's counsel at the First *DuBay* Proceeding, appellant already has received all necessary relief. Specifically, the Second *DuBay* Proceeding has eliminated any unfairness to appellant in this regard by allowing the appellant to make a thorough inquiry into Dr. Benedek's alleged bias. We must observe, though, that trial counsel knew or should have known that Dr. Benedek's involvement was an issue, and the failure to disclose it served no interest.

**C.** *Participation of Dr. William Keppler*

Appellant also argues that he did not receive a full and fair hearing because Dr. Keppler, one of the two psychiatrists on the 2002 Sanity Board, was a fellow working under Dr. Benedek's supervision. Appellant contends that this subordinate role made Dr. Keppler susceptible to coercion. Appellant finds support for this contention in Dr. Howe's expert testimony quoted above. As noted, Dr. Howe, a government witness, testified he would expect a fellow to feel "profound coercion" not to disagree with his chief.

The government responds with two arguments. First, the government contends that Appellant waived this issue by failing to object to Dr. Keppler's service on the Sanity Board either in the First *DuBay* Proceeding or in its supplemental pleading before this court after the First *DuBay* Proceeding. Second, the government emphasizes that Dr. Keppler testified that Dr. Benedek did not

pressure him to return any particular finding and did not influence his decisions. We agree with both contentions. Appellant had the opportunity to object to Dr. Keppler's participation on the board, but made no objection. In addition, appellant's argument that Dr. Keppler should not have participated on the board lacks merit. Under *Best*, as we have discussed above, a member of an R.C.M. 706 Sanity Board is disqualified only for an actual conflict of interest. Although Dr. Howe suggested possible grounds for impeaching Dr. Keppler's conclusions, no actual conflict of interest has been shown. An actual conflict of interest is a relationship that "'materially limits [a psychotherapist's] ability to objectively participate in and evaluate the subject of an R.C.M. 706 sanity board.'" *Best*, 61 M.J. at 387 (quoting *United States v. Best*, 59 M.J. 886, 892 (Army Ct. Crim. App. 2004)). The record reveals that Dr. Keppler was not materially limited. There is no per se rule that prevents sanity boards from including an expert who is supervised by another expert on the board.

## III.  Burden and Standard of Proof

Appellant's second assignment of error charges that the *DuBay* military judge erred in his ruling on the premeditation and mental responsibility issues because he improperly assigned the burden of proof to appellant and also set incorrect standards of proof.[5] Addressing the burdens and standards of proof,[6] the military judge said:

> As appellant is the moving party, I assigned the burden of persuasion to the defense to establish the relevant facts upon which he seeks relief,

---

[5] II. CONTRARY TO THE PARTIES URGING AT TRIAL, THE MILITARY JUDGE ERRED IN DESIGNATING APPELLANT AS THE "MOVING PARTY" AT BOTH *DUBAY* HEARING WITH A CONCOMITANT BURDEN TO PERSUADE THE MILITARY JUDGE: (1) "THAT A REASONABLE INSANITY DEFENSE COULD HAVE BEEN MOUNTED WITH THEIR NEW EVIDENCE GIVEN THE CLEAR AND CONVINCING EVIDENCE STANDARD OF RCM 916(b); OR  (2) THAT A REASONABLE MENTAL PROBLEM COULD HAVE BEEN OFFERED TO DIMINISH THE INTENT ELEMENT DOWNWARD FROM PREMEDITATED MURDER TO A LESSER CRIME; OR (3) THAT A REASONABLE MENTAL HEALTH ISSUE COULD HAVE BEEN DEVELOPED DURING THE SENTENCING PHASE OF THE TRIAL TO AVOID THE DEATH PENALTY; AND (4) SOME COMBINATION OF THE ABOVE THREE POSSIBILITIES."

[6] The "burden of proof" determines which party has the "duty to prove a disputed assertion or charge;" for example, in a criminal case, the government has the burden to prove the defendant's guilt. *Black's Law Dictionary* 190-91 (8th ed. 2004). This term encompasses both the burden of production and burden of persuasion. *See id*. The "standard of proof" is "the degree or level of proof demanded in a specific case;" for example, the standard of proof of offenses in a criminal case is proof beyond a reasonable doubt. *Id*. at 1413.

18

by the preponderance of the evidence.  With respect to those factual issues associated with the defense of lack of mental responsibility, I also assigned the burden of proof to the defense, with the standard of proof by clear and convincing evidence, as articulated in Rule for Courts-Martial (RCM) 916(b).

## A.  Premeditation

We consider first the issue of whether appellant's mental condition may have prevented him from forming the intent necessary to commit premeditated murder. Appellant reads the military judge's statement that he assigned "the burden of persuasion to the defense to establish the relevant facts upon which he seeks" to mean that the military judge imposed the burden on appellant to prove that "a reasonable mental problem could have been offered to diminish the intent element downward from premeditated murder to a lesser crime."  Appellant contends that the *DuBay* military judge instead should have required the government to prove that "not even one panel member might have had a reasonable doubt as to the element of premeditation after hearing the post-trial evidence."  Appellant reasons that the government had the burden at trial to prove beyond a reasonable doubt that appellant had a premeditated design to kill each of the victims, *see* R.C.M. 918(c), and that he would be eligible to receive the death penalty only if he was convicted of premeditated murder by the concurrence of all the members of the court-martial, see R.C.M. 1004(a)(2).

The government responds that the military judge properly understood the government has the ultimate burden to prove each element of the offenses beyond a reasonable doubt.  But the government contends that it already satisfied this burden at trial.  According to the government, the purpose of the *DuBay* hearing was to determine whether the post-trial evidence was sufficiently believable—in other words, more likely than not to be factually accurate—to justify a new trial.  On this more limited issue, the government contends, appellant had the burden of proof.

We agree with the government.  As we have noted, our superior court directed us to "[r]eview the new evidence to determine if a different verdict as to findings might reasonably result in light of post[-]trial evidence."  We believe that this statement establishes both the standard and burden of proof applicable to the issue before us.  The standard is whether a different verdict "might reasonably result." We interpret this language also to indicate that the burden is on the appellant to show that a different verdict "might" result, not on the government to show that it "would not."  If our superior court were ordering us to require the government to prove the negative, it would have phrased its directive differently.  We therefore conclude that the military judge did not err.

## B. Mental Responsibility

A similar analysis applies to the burden and standard of proof with respect to the issue of mental responsibility. Under our superior court's directive, appellant had the burden in the *DuBay* proceedings to prove that a "different verdict might reasonably result" based on the new evidence. The court-martial that convicted appellant did not consider a defense of lack of mental responsibility. However, if the court-martial had considered this defense, the accused would have had "the burden of proving the defense of lack of mental responsibility by clear and convincing evidence." R.C.M. 916(b). Accordingly, a different verdict might reasonably result only if post-trial evidence could establish the defense of lack of mental responsibility by clear and convincing evidence. From his statement quoted above, we conclude that the *DuBay* military judge correctly understood and applied these burdens. We have considered appellant's argument that the *DuBay* military judge's actual application of this standard was "convoluted" and "confused," but we find no merit to these contentions.

## IV. Production of Ms. Jill Miller as a Witness

Appellant next argues that the military judge erred by refusing to order the production of Ms. Jill Miller to provide expert assistance.[7] This argument requires some background to understand. Ms. Miller is a forensic social worker who prepared a 50-page report in 1993 about appellant's social history. *See Murphy*, 50 M.J. at 13. This report was influential in our superior court's decision to vacate the death penalty and inquire further into appellant's mental health. After we ordered the First *DuBay* Proceeding, appellant moved for the production of Ms. Miller. Appellant argued that he needed Ms. Miller for three reasons: (1) to locate mitigation witnesses and establish rapport with them; (2) to update and review her 1993 social history report; and (3) to determine whether additional testing was necessary. The *Dubay* military judge, however, denied the motion on the grounds appellant had "failed to demonstrate what a non-medically trained individual can accomplish [that] is not already accomplished by the sanity board of medical experts." Appellant challenged the denial of his motion for the production of

---

[7] III. AFTER INAPPROPRIATELY DESIGNATING APPELLANT AS THE MOVING PARTY WITH THE CONCOMITANT BURDEN OF PERSUASION, THE MILITARY JUDGE FURTHER ERRED BY REFUSING TO ORDER THE PRODUCTION OF MS. JILL MILLER, THE FORENSIC SOCIAL WORKER WHO WAS INSTRUMENTAL IN THE DEVELOPMENT OF ISSUES NECESSITATING THE *DUBAY* HEARING, TO BE APPOINTED TO ASSIST THE DEFENSE IN PREPARATION FOR THE *DUBAY* HEARING, DECLARING THAT THE POST-TRIAL EVIDENCE IN THE CASE IS CLOSED FOR THE DEFENSE.

Ms. Miller through an extraordinary writ. This court denied relief, and our superior court denied review. *See United States v. Murphy*, 57 M.J. 161 (C.A.A.F. 2002) (table). Accordingly, appellant did not have the benefit of Ms. Miller's assistance during the First *DuBay* Proceeding.

When we remanded the case for the Second *DuBay* Proceeding, appellant again moved for the assistance of Ms. Miller, and the *DuBay* military judge again denied the motion. Appellant now renews the challenge. Both parties agree that our superior court has announced a three-part test for determining whether expert assistance is necessary: "The defense must show: (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop." *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005). Both parties agree that we must review the military judge's decision for abuse of discretion. *Id.* at 143.

Appellant contends that the military judge should have recognized that the 1993 social history did not "contain sufficient information on [appellant's] circumstances and functioning" before, during, and after the offense. Appellant asserts that a more detailed social history would have aided both the 2002 Sanity Board and the defense experts. Appellant points out that the defense experts specifically indicated during the First *DuBay* hearing that a more detailed social history would have helped them evaluate the case. Appellant further argues that defense counsel could not be expected to accomplish the investigative work of a trained forensic social worker.

The government responds that the military judge did not abuse his discretion for several reasons. First, although the type of mitigation evidence Ms. Miller might have produced could be relevant to sentencing, it was not relevant to the specific questions addressed in the First and Second *DuBay* Proceedings. The government argues that these proceedings were ordered for the limited purpose of testing "in the crucible of an adversarial proceeding" the stated opinions of five psychiatric experts on appellant's mental capacity. Second, the government argues that appellant had ample other resources. These resources included the experts who testified in the First and Second *DuBay* Proceedings. Third, the government contends that if appellant had asked Ms. Miller to revise her report, the mental health experts would have had to revise their reports, leading to a "never-ending appellate fishing expedition." Fourth, the government asserts that none of the appointed mental health experts asserted that they were incapable of conducting reliable mental health evaluations or unable to identify a need for additional tests.

Applying the abuse of discretion standard, we uphold the military judge's denial of the motion to compel the production of Ms. Miller. As the government correctly argues, an updated social history report would primarily be relevant to

sentencing, not to the question of whether appellant was able to form the intent necessary to support the finding of premeditated murder. Appellant does not contend that Ms. Miller herself could have provided an expert opinion on that subject. In these circumstances, the military judge did not abuse his discretion.

## V. Insufficient Evidence of Premeditation

Appellant's fourth assignment of error is that, in light of the expert testimony, we should conclude that the government did not present sufficient evidence of premeditation.[8] We must evaluate this contention using the standards that our superior court previously gave us. As described above, the court directed us to determine whether "a different verdict might reasonably result" in light of the new evidence. In *United States v. Dock*, 28 M.J. 117 (C.M.A. 1989), our superior court expressed another way of looking at this same standard. The Court said: "The question of 'whether … a different verdict might reasonably result' is not different from asking whether a factfinder 'might have a reasonable doubt' after hearing the evidence." *See id.* at 119-20. After long and careful review of the voluminous materials, we conclude that a different verdict would not reasonably result.

The court-martial found that the government had proved beyond a reasonable doubt that appellant had acted with the requisite intent for premeditated murder and we did not disturb this finding when the case previously came before us. *See Murphy*, 36 M.J. 1137. Now we have new evidence from the First and Second *DuBay* Proceedings. After careful consideration of the entire record, we conclude that this new evidence, taken as a whole, does not create a reasonable doubt about whether appellant could have formed the requisite intent to commit premeditated murder. Indeed, as shown below, the new evidence when fairly considered actually makes the government's case stronger, not weaker. Accordingly, we hold that the new evidence would not likely produce a more favorable outcome for appellant. Instead, if presented with both the original evidence and the new evidence, a panel would come to the same conclusion: the evidence shows that appellant committed

---

[8] IV. AT LEAST ONE MEMBER MIGHT HAVE CONCLUDED THAT THE GOVERNMENT DID NOT PROVE PREMEDITATION BEYOND A REASONABLE DOUBT WHERE: (1) THREE QUALIFIED EXPERTS TESTIFIED AT THE *DUBAY* HEARING THAT APPELLANT COULD NOT PREMEDITATE AT THE TIME OF THE OFFENSES; AND (2) THE GOVERNMENT EXPERTS, WHILE DISAGREEING WITH THE CONCLUSION OF THE DEFENSE EXPERTS, ADMITTED THAT REASONABLE EXPERTS COULD REACH DIFFERING CONCLUSIONS BASED ON THE SAME BODY OF INFORMATION AS THE DETERMINATION OF THE LEVEL OF ONE'S COGNITIVE DYSFUNCTION IS A COMBINATION OF SCIENCE AND ART.

the premeditated murders of Petra Murphy, Tim A. Herstroeter, and James Murphy Jr. beyond any reasonable doubt.

As shown in detail in part I.A. above, the government presented very strong evidence at trial that the appellant premeditated the three murders. He told other soldiers that he would kill his wife if he had to pay alimony. He investigated, both in a taxi and his own car, the apartment complex where his wife lived. He brought a hammer with him to his wife's apartment on the day of the murder. He brought gloves, even though it was August. He committed the killings without leaving fingerprints. He filled the bathtub to the level necessary for drowning Tim and James Jr. He decided to kill Tim so that Tim could not be a witness. He went to the bedroom and retrieved his own son, James, Jr., so that he could kill him too. He reasoned in advance that leaving James Jr. alive might cast suspicion on him.

The new evidence, on a whole, strengthened the government's case by confirming that appellant had the mental capacity to premeditate. The 2002 Sanity Board concluded that appellant had the capacity to premeditate and that he did not suffer from PTSD, FAS, or depression. This board looked at all of the available evidence. It found that appellant's major cognitive problem is a "mental slowing," but that this problem did not preclude him from making plans or premeditating crimes. The three members of the 2002 Sanity Board testified that they individually agreed appellant had the capacity to premeditate. Dr. Benedek and Dr. Keppler each had conducted clinical interviews of appellant, and Dr. Clement administered and evaluated a series of psychological tests.

The defense made little headway impeaching the conclusions of the 2002 Sanity Board. Dr. Schmidt testified that the Board should have performed additional tests. This testimony, however, was weakened by the reality, recognized by the military judge, that appellant's counsel did not object to the tests administered by the board or request additional testing. True, each of the government witnesses acknowledged other diagnoses and conclusions were possible. But they did not suggest that other results were likely and they did not ascribe to them. The military judge, moreover, found their testimony credible, and we see no basis to disagree.

The defense evidence, in comparison, was weak. Dr. Kirby concluded that appellant could not have formed the requisite intent to commit premeditated murder on the theory that appellant acted in a dissociative state. But this theory rested on two conjectures, one was that appellant suffers from PTSD-related flashbacks and the other was that something happened to trigger a PTSD flashback on the night of the murders. The support for these conjectures was slim, and the evidence against them was strong. The 2002 Sanity Board concluded that appellant did not suffer from PTSD because he did not exhibit the usual symptoms. Perhaps more significant, we find it impossible to believe that appellant acted in a dissociative

state given that he meticulously cleaned the apartment and then recalled important details about the crimes in his subsequent statements.

Dr. O'Connor also concluded that appellant lacked the capacity to premeditate, based on mental impairment and PTSD in remission. The mental impairment theory finds little support in facts; the record reveals that appellant did engage in planning, both in his general military service and in the execution of his crimes. The testing performed by Dr. Clement also shows a capacity to plan. Dr. O'Connor's PTSD theory rests improbably on the similar conjectures to those made by Dr. Kirby.

Dr. Merikangas offered several theories for why appellant could not form the requisite intent, described above at paragraph I.F.1. The 2002 Sanity Board, whose members the military judge found more credible, rejected the theories that appellant suffered from depression or FAS. In addition, we cannot square Dr. Merikangas's testimony with the facts. Appellant engaged in substantial planning. His conduct and statements following the attacks contradict the hypothesis that appellant acted in a dissociative state.

In addition to these specific problems, the *DuBay* military judge, who observed the demeanor of the witnesses and their manner of testifying, concluded that appellant's witnesses were all less credible than Dr. Benedek, and that Dr. Merikangas displayed an "obvious bias." These determinations of credibility are highly significant; we ordered the *DuBay* proceedings precisely so that an assessment of the new evidence would not rely solely on dry affidavits and reports. *See Murphy*, 56 M.J. at 647-648.

In sum, we recognize that the government has the burden of proving all of the elements of every offense beyond a reasonable doubt. *See* R.C.M. 918(c). The court-martial determined that the government met this burden before the discovery of new evidence and we agreed with this finding in our earlier ruling on the merits in this case. *Murphy*, 36 M.J. 1137. We now conclude that the government also would have met this burden if the court-martial had considered the new evidence. A more favorable verdict would not reasonably result. The new evidence does not raise reasonable doubt. On the contrary, if all of the evidence had been before the panel, the evidence would have only confirmed the correctness of the finding of appellant's guilt.

## VI. Choice of Resentencing or Affirming a Sentence of Life Imprisonment

In remanding the case, our superior court instructed us that, if we determine "a different verdict would not reasonably result as to findings," then we "may either affirm appellant's sentence only as to life imprisonment and accessory penalties, or [we] may order a rehearing as to the death sentence." *Murphy*, 50 M.J. at 16. We

have this choice because death and life imprisonment were the only two possible sentences for premeditated murder at the time appellant committed his offenses, s*ee* 10 U.S.C. § 918.[9] In his fifth and final argument in these proceedings,[10] appellant contends that, if this court affirms his conviction, it should affirm a sentence of life imprisonment.

Appellant supports this contention with two arguments. First, appellant points out that the Navy-Marine Corps Court of Criminal Appeals chose this result in *United States v. Curtis*, 52 M.J. 166 (C.A.A.F. 1999), a case with a very similar procedural history. In *Curtis*, after various intermediate proceedings, our superior court vacated a death sentence because the defense counsel had been ineffective during the sentencing phase of the trial. On remand, the Navy-Marine Corps Court of Criminal Appeals chose not to order a resentencing proceeding, but instead simply to affirm a sentence of life imprisonment. *See United States v. Curtis*, No. 87-03856, 1998 CCA LEXIS 493 (N-M. Ct. Crim. App. 30 November 1998) (en banc) (per curiam), *aff'd*, 52 M.J. 166 (C.A.A.F. 1999) (per curiam). Appellant believes that we should follow this example.

Second, appellant argues that the record now contains new evidence which likely would cause a panel to choose a sentence of life imprisonment rather than the death penalty. The evidence shows that appellant had a deprived background and that he suffers from brain damage. Indeed, as appellant notes, the *DuBay* military judge specifically found that a "reasonable mental health issue could have been developed during the sentencing phase of the trial based on the new post-trial evidence." Accordingly, appellant argues, we can reasonably conclude upon consideration of the post-trial evidence, that at least one panel member might have believed that appellant should not receive the death penalty.

The government, in contrast, urges that we should remand the case for resentencing for several reasons. It contends that simply affirming a sentence of life imprisonment would unjustifiably prevent a death-qualified panel from hearing all the sentencing evidence and determining whether a penalty of death is warranted. In addition, the government asserts, a decision as serious as life or death should remain within the province of military panels, not military judges. The government also reminds us that affirming a sentence of life imprisonment will not bring finality to the case because appellant still may obtain a review of the findings in this case.

---

[9] Although UCMJ art. 56(a) now provides for a sentence to life imprisonment without parole as an alternative simply to life imprisonment with the possibility of parole, this additional possible sentence was not added until 18 November 1997, long after appellant committed his offenses.

[10] V. EVEN IF THIS COURT DETERMINES THAT A DIFFERENT VERDICT MIGHT NOT REASONABLY RESULT AS TO THE FINDINGS, IT NEVERTHELESS SHOULD AFFIRM A SENTENCE OF LIFE.

We decide to remand the case for further action. We recognize that the new evidence has mitigating characteristics, but we cannot conclude with confidence that this new evidence would preclude a panel from imposing the death penalty. The death penalty is a lawful sanction provided that all of the procedures have been followed and all necessary proof has been made.

## VII. Conclusion

Our court is still bound by the instructions that our superior court gave us in 1998. In accordance with instructions (1) and (2), we now have finished our review of the post-trial evidence and we determine that a different verdict as to findings would not reasonably result. In accordance with instruction (3), we decide to authorize a rehearing as to the death sentence. Given our decisions, instructions (4) and (5) are inapplicable.

Our superior court has vacated the sentence. We now return the record to the Judge Advocate General for remand to an appropriate convening authority. The convening authority is authorized to order a rehearing on sentence at which either a sentence of death or a sentence of life imprisonment may be imposed.

Senior Judge GALLUP and Senior Judge ZOLPER concur.



FOR THE COURT:

*Mary B. Chapman*

MARY B. CHAPMAN
Deputy Clerk of Court